RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0188p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

VON CLARK DAVIS,

        *Petitioner-Appellant,*

    *v.*

CHARLOTTE JENKINS, Warden,

        *Respondent-Appellee.*

No. 21-3404

───────────────

On Petition for Rehearing En Banc
United States District Court for the Southern District of Ohio at Columbus.
No. 2:16-cv-00495—Susan J. Dlott, District Judge.

Argued En Banc:  March 20, 2024

Decided and Filed:  August 20, 2024

Before:  SUTTON, Chief Judge; MOORE, COLE, CLAY, GIBBONS, GRIFFIN,
KETHLEDGE, STRANCH, THAPAR, BUSH, LARSEN, NALBANDIAN,
READLER, DAVIS and MATHIS, Circuit Judges.[*]

───────────────

## COUNSEL

**ARGUED EN BANC:**  Erin G. Barnhart, OFFICE OF THE FEDERAL PUBLIC DEFENDER
FOR THE SOUTHERN DISTRICT OF OHIO, Columbus, Ohio, for Appellant.  T. Elliot Gaiser,
OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.  **ON
SUPPLEMENTAL BRIEF:**  Erin G. Barnhart, Jordan S. Berman, OFFICE OF THE
FEDERAL PUBLIC DEFENDER FOR THE SOUTHERN DISTRICT OF OHIO, Columbus,
Ohio, for Appellant.  T. Elliot Gaiser, Michael J. Hendershot, Jana M. Bosch, Stephen E. Maher,
OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

      GIBBONS, J., delivered the opinion of the court in which SUTTON, C.J., and GRIFFIN,
KETHLEDGE, THAPAR, BUSH, LARSEN, NALBANDIAN, and READLER, JJ., joined.

───────────────

[*]Pursuant to 6 Cir. I.O.P. 35(c), Composition of the En Banc Court, Judge Cole, a senior judge of the court
who sat on the original panel in this case, participated in this decision. Judge Murphy and Judge Bloomekatz recused
themselves from participation in this decision.

MOORE, J. (pp. 29–62), delivered a separate dissenting opinion in which COLE, CLAY, STRANCH, and DAVIS, JJ., joined in full and MATHIS, J., joined in Part I.A.

_____

**OPINION**

_____

JULIA SMITH GIBBONS, Circuit Judge. In 1984, a Butler County, Ohio court tried and convicted Von Clark Davis of aggravated murder with a capital specification for a prior conviction of purposeful killing of another. Forty years later, Davis is before us on habeas review of the third death sentence for this conviction. Today, we accord the Ohio courts the deference owed their adjudication of Davis's various claims and deny his petition for habeas relief.

I.

The facts relevant to each of Davis's habeas claims span nearly 40 years of proceedings. In 1971, Davis pled guilty to second-degree murder for the purposeful killing of his wife, Ernestine Davis. *State v. Davis*, No. CA95-07-124, 1996 WL 551432, at *1 (Ohio Ct. App. Sept. 30, 1996). While on parole for that conviction in 1983, Davis shot and killed his ex-girlfriend, Suzette Butler. *State v. Davis*, 9 N.E.3d 1031, 1036 (Ohio 2014). In January 1984, a Butler County, Ohio grand jury indicted Davis for aggravated murder (with a capital specification based on his 1971 conviction for purposeful killing of another) and possessing a firearm while under a disability.

Prior to trial, Davis's counsel submitted an election pursuant to Ohio Rev. Code § 2929.022, by which Davis elected to waive his right to a jury trial and instead be tried and sentenced by a panel of three judges. Davis's counsel also submitted a "Motion for Notice of Prospective Three-Judge Panel," the stated purpose of which was to obtain "some information as to . . . what the panel would consist of, what judges, so we can inform Mr. Davis of that fact." DE 5-1, Tr. of Motions, Page ID 7209. Judge Henry Bruewer, conducting the proceedings, responded: "For the record, you know the three judges would be the ones that are here in the General Division, it would be Judge Stitsinger, Judge Moser and myself." *Id.*

A few days later, the court conducted a colloquy with Davis to confirm his jury waiver. During this colloquy, the court did not mention the names of the three judges; it stated only that Davis was waiving his right to trial by jury for submission of his case "to a panel of three judges." *Id.* at 7222–24. After Judge Bruewer completed the colloquy, he forecasted to trial the next day, saying "we'll have three judges [who] will be here tomorrow, you know who they are, and they're in this form here. It'll be myself and Judge Moser and Judge Stitsinger." *Id.* at 7225.

The waiver form, signed by Davis and his counsel, stated that Davis "voluntarily waive[d] [his] right to trial by jury and elect[ed] to be tried by a court to be composed of three judges, consisting of Judges Henry J. Bruewer, William R. Stitsinger, and John R. Moser, all the same being the elected judges of the General Division of the Court of Common Pleas of Butler County who are engaged in the trial of criminal cases." DE 4-3, Jury Waiver and Election of Three-Judge Panel, Page ID 433. The court signed a supplemental sentence below Davis's election, which stated: "This jury waiver and election to be tried by a three-judge panel is hereby accepted and entered upon the journal of this Court." *Id.*

The three-judge panel convicted Davis on both counts and applied the death penalty. The basis for the death penalty was the panel's finding that Davis was guilty of the capital specification, a prior conviction for the purposeful killing of another. On direct appeal, the Ohio Supreme Court affirmed Davis's convictions but vacated his death sentence. *State v. Davis*, 528 N.E.2d 925, 936 (Ohio 1988). On remand, the same three-judge panel held a second sentencing hearing and again sentenced Davis to death. That sentence was affirmed on appeal. *State v. Davis*, CA89-09-123, 1990 WL 165137, at *1, *5 (Ohio Ct. App. Oct. 29, 1990), *aff'd*, 584 N.E.2d 1192, 1198 (Ohio 1992).

Davis subsequently filed his first habeas petition, and a panel of this court vacated Davis's second death sentence. *Davis v. Coyle*, 475 F.3d 761, 781 (6th Cir. 2007). By the time of Davis's third sentencing hearing in 2009 (his second *re*sentencing), one of the judges from the original panel had died, and the other two had retired. *State v. Davis*, No. CA2009-10-263, 2011 WL 646404, at *2 (Ohio Ct. App. Feb. 22, 2011). A new three-judge panel was constituted, and that panel refused Davis's motion to withdraw his 1984 jury waiver and proceeded with the sentencing hearing. *Id.*

One of the judges on this panel, Judge Andrew Nastoff, had previously worked as a prosecutor. During that time, Judge Nastoff had been on the prosecution team that had sought a death sentence against Lahray Thompson, Davis's nephew, for an unrelated murder. Carol Smith, Davis's sister and Thompson's mother, testified at Davis's sentencing hearing. She spoke about Davis's parents and siblings, childhood memories with Davis, their home life while growing up together, and her preference for Davis to receive a life sentence. Carol had not testified at Thompson's mitigation trial.

After Carol had finished her testimony, Judge Nastoff announced on the record that "[d]uring the testimony of the last witness, Carol Smith, she indicated that she was the mother of [Lahray] Thompson and I just felt that it is necessary to disclose on the record that I was a member of the prosecution team against [Lahray] Thompson" and that he had "argued to the jury that [Thompson] should receive the death sentence." DE 5-7, Mitigation Hr'g Tr., Page ID 8321. Davis's counsel responded, "we were aware that . . . you were involved in the prosecution, and we made a decision long ago not to challenge you on that." *Id.* at 8322.

Next, defense counsel called Ohio Parole Board Chair Cynthia Mausser as a witness, having forecasted that she would testify that Davis would never be paroled if given a life sentence. The prosecution objected to Mausser being called, explaining that Mausser had told them she could not testify whether or not she would vote for parole, as the case had not yet been presented to the parole board and such testimony would be speculation. Additionally, the prosecution reported, Mausser was just one member of the parole board, composed of seven to twelve people, and so Mausser could not speak on behalf of the board. Defense counsel pushed forward, maintaining that they would "be in a position of surprise" if Mausser "testifies as the prosecution is suggesting," as defense counsel had "interviewed her four months ago" and "that that is not what we were told." *Id.* at 8327. The three-judge panel allowed her to testify.

Mausser testified on direct examination that the average amount of time served for an aggravated murder conviction before parole was about 27 years, past Davis's life expectancy. Mausser added that those with aggravated murder convictions who are eligible for parole "generally do not get released at" their first parole hearing. *Id.* at 8361. After being given a hypothetical case mirroring Davis's situation, Mausser concluded that such a person "would

likely spend a large portion of the remainder of their life in prison" and that it would be "unlikely" that such an individual would be granted parole in his first hearing.  *Id.* at 8364–65.  On cross-examination, Mausser admitted that, at this point, she did not have all of the information needed to make a parole determination, and she also acknowledged that the parole determination was a collective decision, so she could not say how any other member on the parole board would vote.  In its written sentencing opinion, the panel acknowledged her testimony but ultimately concluded it was highly speculative and "entitled to no weight."

The day after Mausser testified, defense counsel called Dr. Robert Smith, an expert witness in clinical psychology and addiction.  Smith testified that, at the time of the offense, Davis suffered from two psychological disorders—alcohol dependence and borderline personality disorder.  Smith testified that one of the characteristics of borderline personality disorder was "unwarranted aggressive behavior that comes about with minor provocation."  DE 5-8, Mitigation Hr'g Tr., Page ID 8451.  He explained that those with borderline personality disorder thrive in "structured environment[s], with clear-cut rules and people who enforce those rules every day."  *Id.* at 8448.  Smith opined that Davis had limited incidents in prison because he thrived in the structured environment.  In its sentencing opinion, the panel acknowledged Smith's testimony but noted his failure to forecast Davis's behavior outside of prison or recommend a treatment plan should he be released, ultimately entitling Smith's diagnosis to "little weight in mitigation."

After the close of the mitigation hearing, the three-judge panel issued a written opinion sentencing Davis to death for a third time.  Most persuasive for the panel was the sole aggravating circumstance, Davis's prior conviction for second-degree murder.  The panel held that the sole aggravating circumstance outweighed, beyond a reasonable doubt, the mitigating factors presented.

Davis's sentence was affirmed on direct appeal.  *Davis*, 2011 WL 646404, at *23, *aff'd*, 9 N.E.3d at 1057.  Davis also sought post-conviction relief in state court, which was denied.  *State v. Davis*, No. CA2012-12-258, 2013 WL 4806935, at *1 (Ohio Ct. App. Sept. 9, 2013), *appeal not accepted for review*, 36 N.E.3d 188 (Ohio 2015) (unpublished table decision).  In 2016, Davis filed a habeas petition raising 26 grounds for relief.  The district court denied the petition.

After a panel of this court granted habeas relief on three claims, a majority of the court voted to rehear this case en banc.

## II.

We review de novo a district court's decision to deny a writ of habeas corpus. *Foust v. Houk*, 655 F.3d 524, 533 (6th Cir. 2011). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings" only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established federal law if "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at" a different result. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A state court decision unreasonably applies clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08. "Clearly established federal law" refers to the holdings, not dicta, of Supreme Court decisions at the time of the relevant state court decision. *Id.* at 412; *Stojetz v. Ishee*, 892 F.3d 175, 192 (6th Cir. 2018).

This standard in § 2254(d) is difficult to meet, as intended. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Section 2254(d) "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings" and allows issuance of the writ only in cases "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. *Id.* Section 2254(d) is "not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (citation omitted). "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law

beyond any possibility for fairminded disagreement." *Id.* at 103. "Clear error does not suffice." *Stojetz*, 892 F.3d at 192 (citation omitted).

## III.

Davis presents six claims for this court's en banc review:

1. Whether the enforcement of Davis's 1984 jury waiver at his 2009 resentencing hearing denied him due process under the Fourteenth Amendment and/or violated the Sixth and Eighth Amendments.

2. Whether Davis's 1984 jury waiver was knowing or intelligent because he did not know that, when he waived his right to a jury trial in 1984 to be tried by three specifically identified judges, he could later be sentenced by three different judges.

3. Whether the 2009 resentencing counsel were ineffective for failing to seek recusal of one of the judges for bias.

4. Whether the 2009 resentencing counsel were ineffective for failing to reasonably prepare for and present mitigation evidence as to parole eligibility and reintegration.

5. Whether the 2009 resentencing counsel were ineffective for failing to investigate and present mitigating evidence about the circumstances of Davis's 1971 conviction.

6. Whether the 1984 trial counsel were ineffective for failing to advise Davis properly about waiving his right to a jury trial.

For the following reasons, we deny each of Davis's six claims and affirm the district court's denial of habeas relief.

## A.

Davis first argues that the State violated his rights under the Sixth Amendment, the Eighth Amendment, and the Due Process Clause of the Fourteenth Amendment by breaching the "explicit terms" of his 1984 jury waiver. By refusing Davis's withdrawal of his waiver and forcing him to be sentenced by three judges not named in the waiver, Davis contends, the State denied him the benefit of his bargain to be sentenced by three specific judges and thus violated his constitutional rights to "fundamental fairness."

To begin, we consider exhaustion and procedural default. Before filing a habeas petition, "a state prisoner must exhaust available state remedies." *Davila v. Davis*, 582 U.S. 521, 527 (2017); *see* 28 U.S.C. § 2254(b)(1)(A). "Ordinarily, a state prisoner satisfies this exhaustion requirement by raising his federal claim before the state courts in accordance with state procedures." *Shinn v. Ramirez*, 596 U.S. 366, 378 (2022). This requires a prisoner to "'fairly present' his claim" in the appropriate state court. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) (per curiam)). The prisoner must present to the state courts "the same claim under the same theory." *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009). He must also make the state courts aware of the "federal nature of the claim." *Baldwin*, 541 U.S. at 29. The Sixth Circuit considers four factors to determine whether a state prisoner has "fairly presented" his federal claim in state court. We evaluate whether the petitioner:

> (1) relied upon federal cases employing constitutional analysis; (2) relied upon state cases employing federal constitutional analysis; (3) phrased the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleged facts well within the mainstream of constitutional law.

*Hand v. Houk*, 871 F.3d 390, 418 (6th Cir. 2017). The key thrust of these factors is to determine whether the petitioner "gave the state courts the opportunity to apply the legal principles governing" his present claim. *Jalowiec v. Bradshaw*, 657 F.3d 293, 304 (6th Cir. 2011). "It is not enough" that his prior claims "implicated some of the same facts that are integral" to his current claim. *Id.* "The bottom line is" whether "the state courts were . . . called upon to apply the legal principles governing the constitutional claim now presented to the federal courts." *Id.* "Simply presenting the claim clothed in an analogous theory of relief will not do." *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017). Where a state prisoner fails to raise his federal claim in state court, and the state remedy is no longer available to him, the claim is procedurally defaulted. *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015); *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012); *see also Ramirez*, 596 U.S. at 378.

The Warden argues that Davis's "bargained-for" theory is procedurally defaulted, as Davis argued a wholly distinct theory—that he had a right to withdraw his waiver because continuing to apply it violated a "constitutional mandate for jury sentencing" per the Eighth

Amendment, due process, and *Duncan v. Louisiana*, 391 U.S. 145 (1968)—during his direct appeal.  CA6 R. 54, Suppl. Appellee Br., at 6 (quoting DE 4-43, Ohio Sup. Ct. Merit Br., Page ID 5868–72).  To an extent, the Warden is correct:  At least until the point of oral argument before the Ohio Supreme Court, Davis had not raised the bargain theory in state court.  Davis's briefing did not give the Ohio state courts the opportunity to apply the legal principles governing a bargain with the state.  *See Jalowiec*, 657 F.3d at 304.  Davis did not cite in his briefs before the Ohio state courts any of the bargain theory precedent he now raises.  *See Hand*, 871 F.3d at 418.  Instead, Davis argued a wholly distinct theory—that Ohio violated his due process, Sixth Amendment, and Eighth Amendment rights by subjecting him to a "stale" waiver "when the law has changed and the facts have changed."  DE 4-42, Ohio Ct. App. Merit Br., Page ID 5496.  This theory did not rely on a bargain with the state, but rather claimed that the changed circumstances in their entirety altered the landscape so drastically that it was unfair for Davis to be held to the same waiver.  When Davis did mention the new judges on the panel, he was listing them as one of the many changed circumstances, in addition to new mitigation evidence and new attorneys, that entitled him to reevaluate his waiver.  It is not enough that Davis's claims "implicated some of the same facts." *Jalowiec*, 657 F.3d at 304.  These "analogous theor[ies] of relief will not do." *Kelly*, 846 F.3d at 828.  Until oral argument before the Ohio Supreme Court, Davis did not call on the Ohio state courts "to apply the legal principles" governing his claim that he bargained for the three specific judges named in his waiver and that the State violated this bargain. *Jalowiec*, 657 F.3d at 304.

Davis's strongest case for fair presentation arises from his oral argument before the Ohio Supreme Court.  There, Davis's counsel asserted: "The state can no longer live up to their end of the bargain. . . . We haven't got, and they cannot deliver, what our client waived his jury for." Oral Argument at 7:26, *State v. Davis*, No. 2011-0538 (Oct. 22, 2013), https://ohiochannel.org/video/case-no-2011-0538-von-clark-davis-v-state-of-ohio; *see also id.* at 7:17, 8:12, 10:45, 22:10.  In response, several justices engaged with this argument, asking questions about its implications. *Id.* at 7:41, 8:30, 9:11, 10:00, 11:27, 21:32.  The Warden argues that, by the time Davis raised the theory at oral argument, it was forfeited.  But the Ohio Supreme Court never expressly made that determination.  We therefore will assume, without deciding, that Davis fairly presented his bargain theory.

Turning to the merits, Davis cannot show that the Ohio Supreme Court's decision was contrary to or an unreasonable application of clearly established Supreme Court precedent. As an initial matter, we must determine whether the Ohio Supreme Court, providing the last reasoned state court decision on Davis's claim, adjudicated it on the merits. *See* 28 U.S.C. § 2254(d). A claim is adjudicated on the merits when a judgment has been rendered "after the court . . . heard and *evaluated* the evidence and the parties' substantive arguments." *Johnson v. Williams*, 568 U.S. 289, 302 (2013) (quoting BLACK'S LAW DICTIONARY 1199 (9th ed. 2009)). Following *Harrington v. Richter*, federal habeas courts must apply a "strong but rebuttable" presumption that a federal claim was adjudicated on the merits by the state court. *English v. Berghuis*, 900 F.3d 804, 811 (6th Cir. 2018) (quotation omitted). For example, a state court's unexplained denial of a federal claim is presumed to constitute an adjudication on the merits. *Richter*, 562 U.S. at 98, 102 (explaining that § 2254(d) deference still applies even "[w]here a state court's decision is unaccompanied by an explanation" and that in such a case § 2254(d) applies to the "arguments or theories" that "could have supported[] the state court's decision"); *Ballinger v. Prelesnik*, 709 F.3d 558, 562 (6th Cir. 2013). The *Richter* presumption also applies to state court decisions that address some, but not all, of the defendant's claims, as "it is not the uniform practice of busy state courts to discuss separately every single claim to which a defendant makes even a passing reference." *Williams*, 568 U.S. at 298, 299–300 (explaining, for example, that "there are instances in which a state court may simply regard a claim as too insubstantial to merit discussion"). This strong-but-rebuttable presumption also applies to each part of a multipart claim, "whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." *Richter*, 562 U.S. at 98.

The Ohio Supreme Court adjudicated Davis's jury waiver claim on the merits. In his brief before the Ohio Supreme Court, Davis raised his claim that application of the 1984 waiver violated the Sixth Amendment, Eighth Amendment, and the Due Process Clause. And at oral argument, Davis pressed the bargain theory angle. The Ohio Supreme Court understood the factual basis for Davis's claim. *Davis*, 9 N.E.3d at 1040 ("Davis's claims center on the fact that the three-judge panel that sentenced him in 2009 was not the same three-judge panel before which he had expected to be tried and sentenced when he waived a jury trial in 1984."). Even so,

the court determined that Ohio Rev. Code § 2929.06(B) governed Davis's jury waiver and that the state statute explicitly provided for "a new panel of three judges" to conduct a resentencing "if necessary." *Id.* at 1041 (quoting Ohio Rev. Code § 2929.06(B)). "Given the clear command" of the statute, the Ohio Supreme Court explained that Davis could not obtain relief unless the application of the statute violated his federal constitutional rights. *Id.* at 1041–42. The Ohio Supreme Court then held that "neither the Sixth nor the Eighth Amendment creates a constitutional right to be *sentenced* by a jury, even in a capital case," and so there was "no constitutional bar to conducting [the 2009 resentencing] without a jury pursuant to" § 2929.06(B). *Id.* at 1042. There was thus no federal constitutional prohibition to conducting Davis's 2009 resentencing with a new three-judge panel via § 2929.06(B). *Id.* at 1042, 1043.

Given Davis's briefing and assertions at oral argument, as well as the court's subsequent analysis, it is clear the Ohio Supreme Court "heard and *evaluated*" Davis's substantive arguments. *Williams*, 568 U.S. at 302. As the Ohio Supreme Court found no constitutional bar to conducting Davis's resentencing with a new three-judge panel pursuant to § 2929.06(B), it may have regarded Davis's due process bargain theory claim "as too insubstantial to merit discussion." *Id.* at 299. Finally, Davis did not move for reconsideration or argue in state court that the Ohio Supreme Court inadvertently overlooked his bargain theory claim, which supports the presumption of adjudication on the merits. *See Rogers v. Mays*, 69 F.4th 381, 389 (6th Cir. 2023) (en banc).

AEDPA deference applies to "decision[s]," not opinions or reasoning. *See* 28 U.S.C. § 2254(d)(1)–(2); *Holland v. Rivard*, 800 F.3d 224, 235 (6th Cir. 2015). Davis argues that the state court did not discuss the merits of his bargain theory claim, so AEDPA deference does not apply. This assertion is incorrect. As *Richter* and *Williams* demonstrate, a state court's silence, without more, is insufficient to rebut the presumption of adjudication on the merits. *Richter*, 562 U.S. at 98; *Williams*, 568 U.S. at 298, 299–300; *see Davis v. Johnson*, 661 F. App'x 869, 877–78 (6th Cir. 2016) (holding a state prisoner must "do more than point to the state court's silence to defeat *Richter*'s strong presumption that the state court adjudicated his claim" on the merits). To overcome AEDPA deference, the state court's *decision* must be contrary to clearly established Supreme Court precedent such that "there is no possibility fairminded jurists could disagree that

the state court's decision conflicts with" the Supreme Court's precedents. *Richter*, 562 U.S. at 102. Here, there was no error so egregious that all fairminded jurists would have seen it. *Mack v. Bradshaw*, 88 F.4th 1147, 1154 (6th Cir. 2023). The Ohio Supreme Court's decision comports—not conflicts—with Supreme Court precedent.

Davis acknowledged at oral argument before this court that there is no constitutional right to jury sentencing and that his only claimed constitutional right to being sentenced by the three named judges stems from his bargain theory. Oral Argument at 2:35–3:11, *Davis v. Jenkins*, No. 21-3404 (Mar. 20, 2024), https://www.opn.ca6.uscourts.gov/internet/court_audio/audio/03-20-2024%20-%20Wednesday/21-3404%20Von%20Davis%20v%20Charlotte%20Jenkins.mp3. Davis also acknowledged that the three named judges made all of the factual findings necessary to sentence him to death during his trial in 1984. *Id.* at 4:35–45. Davis thus no longer disputes that the Ohio Supreme Court correctly applied clearly established federal law when it held that "neither the Sixth nor the Eighth Amendment creates a constitutional right to be *sentenced* by a jury, even in a capital case." *Davis*, 9 N.E.3d at 1042; *see also id.* (explaining that the "Sixth Amendment never has been thought to guarantee a right to a jury determination of" the appropriate punishment to be imposed on an individual) (quoting *Spaziano v. Florida*, 468 U.S. 447, 459 (1984)).

This new tack makes sense, as the Ohio Supreme Court's holding offends neither *Ring v. Arizona*, 536 U.S. 584 (2002), nor *Apprendi v. New Jersey*, 530 U.S. 466 (2000). True, *Hurst v. Florida*, 577 U.S. 92 (2016), overruled *Spaziano*, but first, *Hurst* was issued on January 12, 2016, twenty months after the Ohio Supreme Court's decision on April 22, 2014, and second, *Hurst* held only that a jury must find the facts necessary to make the defendant death eligible. *Hurst*, 577 U.S. at 97–99. *McKinney v. Arizona*, 589 U.S. 139 (2020), emphasizes that the decisions in *Ring* and *Hurst* "ha[ve] nothing to do with jury sentencing." *Id.* at 145 (quoting *Ring*, 536 U.S. at 612 (Scalia, J., concurring)). A jury must find the facts necessary to subject a defendant to the death penalty, but the judge may still conduct the weighing of aggravating and mitigating factors to determine whether the defendant should receive the death penalty or some lesser punishment. "[T]he 'States that leave the ultimate life-or-death decision to the judge may continue to do so.'" *Id.* (quoting *Ring*, 536 U.S. at 612 (Scalia, J., concurring)); *see also id.* at

144 ("[I]n a capital sentencing proceeding just as in an ordinary sentencing proceeding, a jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range."). So, Ohio, which occasionally leaves the ultimate life-or-death decision to the judge pursuant to Ohio Rev. Code § 2945.06, may continue to do so. And Davis's 2009 resentencing hearing focused on mitigating factors, not any of the facts that made him death eligible. This court's reversal of Davis's sentencing on habeas review did not demand reconsideration of the "fact[s] necessary to impose a sentence of death." *Hurst*, 577 U.S. at 94; *see Davis*, 475 F.3d at 780. At the 2009 resentencing, the only aggravating circumstance was Davis's prior conviction for second-degree murder, which had already been found by the initial three-judge panel on May 9, 1984. *Davis*, 2011 WL 646404, at *14–15; *State v. Davis*, No. CA84-06-071, 1986 WL 5989, at *2 (Ohio Ct. App. May 27, 1986). The 2009 resentencing panel did not find any new facts with respect to this aggravating circumstance but merely weighed it with the mitigating evidence. *See Davis*, 2011 WL 646404, at *15; *see also McKinney*, 589 U.S. at 144. There was no Sixth or Eighth Amendment bar to conducting Davis's 2009 resentencing without a jury pursuant to Ohio Rev. Code § 2929.06(B).

Davis asserts that the Ohio Supreme Court's decision was contrary to clearly established federal law because clearly established federal law requires fundamental fairness in both limiting the waiver of a constitutional right and enforcing the promises made in inducing the waiver agreement. But Davis has not identified a Supreme Court case holding that enforcement of a jury waiver in a similar circumstance violates fundamental fairness or the Due Process Clause of the Fourteenth Amendment. Davis relies on *Puckett v. United States*, 556 U.S. 129 (2009), *Mabry v. Johnson*, 467 U.S. 504 (1984), and *Santobello v. New York*, 404 U.S. 257 (1971). But such reliance places the level of abstraction of the clearly established Supreme Court precedent too high. *See Fields v. Jordan*, 86 F.4th 218, 232 (6th Cir. 2023) (en banc) ("[P]risoners may not sidestep the lack of Supreme Court precedent on a legal issue by raising the 'level of generality' at which they describe the Court's holdings on other issues."). All three cases dealt with the government's purported violation of a plea agreement, not a jury waiver. *See Puckett*, 556 U.S. at 136; *Mabry*, 467 U.S. at 510; *Santobello*, 404 U.S. at 258. Davis has not cited a Supreme Court case explaining, much less holding, that the contract principles applicable to plea bargain

agreements are also applicable to jury waivers.  *See Woods v. Donald*, 575 U.S. 312, 317 (2015) (per curiam) (holding that a state court decision cannot be contrary to clearly established federal law where no Supreme Court decision has "confront[ed] the specific question presented" (internal quotation marks and citation omitted)).

This lack of precedent is unsurprising, as plea bargains and waivers of constitutional rights are distinct legal concepts.  Waiver is "[t]he voluntary relinquishment or abandonment . . . of a legal right or advantage."  *Waiver*, BLACK'S LAW DICTIONARY (12th ed. 2024).  A plea bargain, on the other hand, is a "negotiated agreement between a prosecutor and a criminal defendant" where the defendant pleads guilty "in exchange for some concession by the prosecutor."  *Plea Bargain*, BLACK'S LAW DICTIONARY (12th ed. 2024).  Defendants routinely waive constitutional rights without inducements, such as waiving the right to remain silent when being questioned by a police officer, *see Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010), waiving the right to representation by counsel, *Faretta v. California*, 422 U.S. 806, 835 (1975), or pleading guilty without a plea deal, thereby waiving the right to trial, *see United States v. Ruiz*, 536 U.S. 622, 628–29 (2002).  These waivers are not bargained-for exchanges.

Reasonable jurists could reject Davis's attempt to paint his waiver as a bargain with the prosecution or the court.  The text of Ohio Rev. Code § 2945.05 emphasizes the unilateral nature of the jury waiver.  Under that provision, Davis had the statutory right to elect trial by the bench rather than a jury, and the court had no discretion to refuse this choice.  *See* Ohio Rev. Code § 2945.05; *State v. Banks*, 151 N.E.3d 198, 201 (Ohio Ct. App. 2019); *State v. Van Sickle*, 629 N.E.2d 39, 43 (Ohio Ct. App. 1993); *see also State v. Ruppert*, 375 N.E.2d 1250, 1254 (Ohio 1978) (explaining that a jury waiver is a "jurisdictional" prerequisite to the appointment of the three-judge panel).  And, unlike a bargain, the statute allows a defendant to withdraw his bench-trial election at any time before trial for any reason.  *See* Ohio Rev. Code § 2945.05.  Once defendants, like Davis, make this election, there is a statutory procedure for designating which judges sit on that panel—defendants do not request the specific judges.  *See* Ohio Rev. Code § 2945.06 (mandating the panel consist of "the judge presiding at the time in the trial of criminal cases and two other judges to be designated by the presiding judge or chief justice of that court"); *State v. Wesson*, 999 N.E.2d 557, 571 (Ohio 2013).

A reasonable jurist could conclude that that statutory procedure was the operating force in Davis's case, regardless of the three judges being listed in his waiver. From the beginning, the presiding judge, Judge Henry Bruewer, established that Davis already knew the identities of the judges.**[1]** DE 5-1, Tr. of Motions, Page ID 7209 ("For the record, you know the three judges would be the ones that are here in the General Division, it would be Judge Stitsinger, Judge Moser and myself."). And the colloquy with Davis did not mention the names of the three judges, only that Davis was waiving his right to trial by jury for submission of his case "to a panel of three judges." *Id.* at 7222–24. It was only outside the colloquy, when the court was forecasting to trial the next day, when it said "we'll have three judges [who] will be here tomorrow, you know who they are, and they're in this form here. It'll be myself and Judge Moser and Judge Stitsinger." *Id.* at 7225. Because, as a matter of statutory procedure, the defendant does not have a say in the judges that make up the panel, a reasonable jurist could conclude that Davis did not "bargain" with the state for the three specific judges.

We are aware of no precedent, federal or otherwise, establishing a due process constitutional right to have a particular judge, and only that judge, make decisions in a criminal defendant's case. Davis likewise has been unable to identify a case in which a plea deal or waiver contains such a commitment. This is to be expected. The law considers judges fungible, based on the underlying presumption that judges conduct themselves with honesty and integrity. *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 194 (3d Cir. 2015) (Ambro, J., dissenting in part and concurring in part); *In re Lowe*, 102 F.3d 731, 733 n.1 (4th Cir. 1996); *see also United States v. Keane*, 375 F. Supp. 1201, 1204 (N.D. Ill. 1974) ("[A] defendant has no vested right to have his case tried before any particular judge."). It is extraordinary, if not unheard of, to obtain this kind of commitment from a trial court. And the terms of the waiver here are insufficient to create such an unusual bargain. The express terms of the 1984 waiver mention only trial, not

---

**[1]**Nor were there other options of judges for Davis to "request." The three judges designated to the panel were the only three judges in the general division of the Butler County Court of Common Pleas at the time. Sherrod Brown, Sec'y of State, The State of Ohio Official Roster Federal, State, County Officers, and Departmental Information 319 (1983–1984).

sentencing. While the waiver colloquy does mention sentencing, that colloquy is outside of the four corners of the document of which Davis demands strict enforcement.

Finally, a reasonable jurist could disregard, based on the facts in the record, Davis's claim that he only waived his right to a jury in return for being tried and sentenced, in perpetuity, by three specific judges. A reasonable jurist could credit Davis's 1993 affidavit, closer in time to the 1984 waiver, explaining his election. Davis, under oath, stated he made the three-judge panel election "because I did not want the jury to hear about my prior murder during the guilt phase of my capital trial." DE 4-19, Aff., Page ID 1964. Davis had filed a motion to sever his charge for having a weapon under a disability from the aggravated murder charge, but the court denied it, meaning the jury would "hear about [his] prior murder." *Id.* at 1965. Davis reported that he "felt the jury would not be able to separate [his] prior murder from the current capital charge," and that as a result he "had no choice but to waive [his] right to trial by jury." *Id.* Davis ended the affidavit by asserting, "[h]ad the trial court severed the charges, I would not have waived my trial by jury." *Id.* A reasonable jurist could credit these earlier and more consistent statements.

In sum, we accord the Ohio Supreme Court's decision to reject Davis's jury waiver claim the deference owed under AEDPA, as its decision did not conflict with or unreasonably apply clearly established Supreme Court precedent. Davis has neither rebutted the strong presumption of adjudication on the merits, nor has he met his steep burden to show an error so egregious that all fairminded jurists would see it.

B.

Alternatively, Davis argues that his 1984 waiver was not knowing, intelligent, and voluntary because he did not know that, when he waived his rights in exchange for trial and sentencing before a panel of three specifically identified judges, he could later be tried or sentenced by three entirely different judges.

Although Davis's unknowing-waiver claim has evolved somewhat throughout his post-sentencing litigation, Davis "'fairly present[ed]' his claim" in the Ohio state courts. *See Baldwin*, 541 U.S. at 29 (quoting *Duncan*, 513 U.S. at 365–66). Davis argued in the Ohio courts that he did not knowingly, intelligently, and validly waive his jury trial and sentencing rights in

1984 for a new sentencing hearing in 2009 with new facts in mitigation, new attorneys, the operation of new statutory provisions, and new judges. While the thrust of his argument relied on the change in circumstances in 2009 more generally, the Ohio Supreme Court recognized that the basis of his claim was the fact that "the 2009 resentencing was conducted before a three-judge panel composed of different judges than the panel that had tried the case in 1984." *Davis*, 9 N.E.3d at 1042. Moreover, Davis's argument put the Ohio courts on notice that he was invoking the federal constitutional principles of knowing, voluntary, and intelligent waiver. *Hand*, 871 F.3d at 418; *Jalowiec*, 657 F.3d at 304.

The Ohio Supreme Court, providing the last reasoned state court decision on this claim, rejected Davis's argument that his 1984 waiver was not knowing, voluntary, or intelligent. *See Davis*, 9 N.E.3d at 1042–43. Davis's argument failed because it required that "a defendant waiving a jury trial possess more information than courts have usually held sufficient for a knowing and intelligent jury waiver." *Id.* at 1042. The court then cited the well-established standard that a defendant is sufficiently informed if he understands "that a jury is composed of 12 members of the community, he may participate in the selection of the jurors, [and] the verdict of the jury must be unanimous," whereas if he were to waive the right, "a judge alone will decide guilt or innocence." *Id.* (quoting *United States v. Martin*, 704 F.2d 267, 273 (6th Cir. 1983)). Knowing the exact identity of the three judges on the panel was not one of the circumstances that made Davis's 1984 waiver knowing, voluntary, or intelligent.

Because Davis presents an exhausted claim that was adjudicated on the merits in state court, AEDPA deference applies. *See* 28 U.S.C. § 2254(d). Davis argues that the Ohio Supreme Court unreasonably applied clearly established federal law, specifically the command in *Adams v. U.S. ex rel. McCann*, 317 U.S. 269 (1942), that the "unique circumstances of each case" dictate whether the waiver is knowing, voluntary, or intelligent. CA6 R. 53, Suppl. Appellant Br., at 13 (quoting *Adams*, 317 U.S. at 278). Davis asserts that the Ohio Supreme Court's decision unreasonably applied *Adams*, *Johnson v. Zerbst*, 304 U.S. 458 (1938), *Boykin v. Alabama*, 395 U.S. 238 (1969), and *Brady v. United States*, 397 U.S. 742 (1970).

We disagree. First, as explained above, the Ohio Supreme Court found there was no constitutional problem with enforcing the waiver at Davis's 2009 resentencing. *Davis*, 9 N.E.3d

at 1042.  Per the analysis in Section III.A., *supra*, this was not an unreasonable application of Supreme Court precedent.  And since there is no constitutional right to a jury weighing the aggravating and mitigating circumstances of a defendant's case, there is no need to determine whether his 1984 waiver was knowing, voluntary, and intelligent for the purposes of his 2009 resentencing.

Even so, the Ohio Supreme Court reasonably applied clearly established federal law.  The four Supreme Court cases that Davis cites reflect the general proposition that waivers of constitutional rights must be knowing, voluntary, and intelligent acts "done with sufficient awareness of the relevant circumstances and likely consequences."  *Brady*, 397 U.S. at 748; *see also id.* at 748 n.6 (citing cases); *Adams*, 317 U.S. at 278; *Johnson*, 304 U.S. at 464; *Boykin*, 395 U.S. at 244.  But, again, Davis raises the level of abstraction too high.  *See Fields*, 86 F.4th at 232; *see also id.* at 236 (emphasizing that "a 'general proposition' that originates with a few quotations from far-afield decisions" is not clearly established law).  The clearly established precedent upon which Davis relies does not require that a defendant be informed of all remotely possible consequences of a waiver, only the "likely consequences."  *Brady*, 397 U.S. at 748; *see also Ruiz*, 536 U.S. at 629 ("[T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it.").  The identity of a sentencing judge has never been one of those "likely consequences."  *See Ruiz*, 536 U.S. at 629–30 (explaining that, for example, a defendant "may waive his right to remain silent, his right to a jury trial, or his right to counsel even if the defendant does not know the specific questions the authorities intend to ask, who will likely serve on the jury, or the particular lawyer the State might otherwise provide.").  Davis asserts that whether a waiver was knowing, voluntary, and intelligent depends, per *Adams*, on "the unique circumstances of each case," and here those unique circumstances included the waiver's naming of three particular judges to the panel.  317 U.S. at 278.  But this is not a unique circumstance that has been clearly established.

Instead, the Court's inquiry of whether "the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances" focuses on the choice

between the two different types of proceedings—jury trial versus bench trial. *See Ruiz*, 536 U.S. at 629–30; *Adams*, 317 U.S. at 278. *United States v. Martin* emphasizes this point.[2] 704 F.2d at 273. For a jury waiver to be knowing, voluntary, and intelligent, a defendant should have "some knowledge of the jury trial right before he is allowed to waive it." *Id.* But the level of knowledge required is not a "technical knowledge of the jury trial right." *Id.* A defendant need only understand that "a jury is composed of 12 members of the community, [that] he may participate in the selection of the jurors, [that] the verdict of the jury must be unanimous, and that a judge alone will decide guilt or innocence should he waive his jury trial right." *Id.*; *Spytma v. Howes*, 313 F.3d 363, 370 (6th Cir. 2002). Davis's insistence that he know the identity of the three judges is a far cry from these basic points.

Moreover, as recognized later in *Sowell v. Bradshaw*, 372 F.3d 821, 833, 836 (6th Cir. 2004), *Martin*'s list is not a statement of constitutional law, but it instead gives a flavor of the type of information that makes a jury waiver knowing, voluntary, and intelligent. Again, the key is whether the defendant understood the type of proceeding he was choosing—jury or judge— not the procedural specifics of either. *See id.* at 836. "[T]he dispositive inquiry is whether the defendant understood that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge." *Otte v. Houk*, 654 F.3d 594, 601 (6th Cir. 2011) (quoting *Jells v. Mitchell*, 538 F.3d 478, 510 (6th Cir. 2008)); *see also Haliym v. Mitchell*, 492 F.3d 680, 698 (6th Cir. 2007). These Sixth Circuit cases demonstrate that the Supreme Court did not clearly establish that a defendant's knowing, voluntary, and intelligent jury waiver must be predicated on the identity of the sentencing judge.

Fairminded jurists could reject Davis's contention that his waiver is invalid because he harbored a private belief that the three named judges would sentence him in perpetuity. *Brady* and *Boykin* do not clearly establish a rule that courts must "probe the minds of defendants in search of myths to bust" before accepting a waiver. *Currica v. Miller*, 70 F.4th 718, 726 (4th Cir. 2023). That principle especially holds true in this case. Judges retire, lose elections, and

---

[2]Although courts of appeals decisions do not create clearly established law for AEDPA purposes, we may look to such decisions to evaluate whether the Supreme Court has clearly established a principle. *Avery v. Prelesnik*, 548 F.3d 434, 436–37 (6th Cir. 2008).

die.  It was not the 1984 trial court's responsibility to dispel Davis's unreasonable expectations about the remotely possible consequences of his waiver.  The Ohio Supreme Court's rejection of this claim is entitled to AEDPA deference, and Davis has failed to overcome such deference.

C.

Next, Davis raises the first of four ineffective assistance of counsel claims.  Davis argues that his 2009 resentencing counsel were ineffective for failing to move for the recusal of Judge Andrew Nastoff, even though counsel knew that Judge Nastoff had previously prosecuted and sought the death penalty for Davis's nephew, Lahray Thompson, for an unrelated murder thirteen years earlier.  The Ohio Court of Appeals provides the last reasoned state court decision on this issue.  The Ohio Court of Appeals concluded that Davis failed to show that his counsel's representation fell below an objective standard of reasonableness and denied the claim.  *Davis*, 2013 WL 4806935, at *6 ("'[T]he decision not to seek recusal of the judge can only be viewed as strategic and will not form the basis of an ineffective counsel claim.'  This is particularly true in this case considering counsel's direct knowledge of Judge Nastoff's prior participation in Thompson's prosecution." (quoting *State v. Nuhfer*, No. L-07-1125, 2009 WL 806905, at *3 (Ohio Ct. App. Mar. 20, 2009))).

We note at the outset that, contrary to the dissent's assertion, a *Strickland* deficient performance claim based on judicial bias is not a two-pronged analysis.  A two-pronged analysis is unsupported by our case law and enables the dissent to avoid applying AEDPA deference where it is merited.  *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (identifying deficient performance and prejudice as two prongs, as opposed to divvying up deficient performance itself); *Rayner v. Mills*, 685 F.3d 631, 636 (6th Cir. 2012) (same).  Instead, the proper analysis takes both elements, judicial bias and deficient performance, together in one prong.

Davis argues that the Ohio Court of Appeals unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), by applying an irrebuttable presumption of reasonableness to counsel's decision.  We disagree that the Ohio Court of Appeals applied an irrebuttable presumption.  *Strickland* cautions that "[j]udicial scrutiny of counsel's performance must be highly deferential," and, accordingly, "a court must indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689. It is the defendant's burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Davis was not able to overcome that presumption before the Ohio Court of Appeals. Davis's briefing did not give any reason to doubt that counsel's decision was sound trial strategy, especially considering that counsel knew about Judge Nastoff's prior prosecution beforehand. While *Strickland* does emphasize a counsel's duty to investigate, "strategic choices made after thorough investigation . . . are virtually unchallengeable," and "strategic choices made after less than complete investigation are reasonable" to the extent that limiting the investigation was reasonably supported. *Id.* at 690–91. Given that counsel knew ahead of time of Judge Nastoff's previous prosecution, as counsel acknowledged at the hearing, the Ohio Court of Appeals could assume that counsel made at least some investigation and could thus apply a "strong presumption"—which Davis failed to rebut—that counsel's choice was "sound trial strategy." *Id.* at 689 (citation omitted).

Investigation of the origin of the quoted language with which Davis takes issue also shows that the Ohio Court of Appeals was not applying an irrebuttable presumption. In the quoted case, *State v. Nuhfer*, the court considered an ineffective assistance of counsel claim through the lens of *Strickland*. *Nuhfer* noted that "[s]crutiny of counsel's performance must be deferential" per *Strickland*, and so "[c]ounsel's actions which 'might be considered sound trial strategy' are presumed effective." 2009 WL 806905, at *3 (quoting *Strickland*, 466 U.S. at 689). *Nuhfer* found that nothing in the case's record indicated that the judge there was biased or had a risk of bias and found that counsel may have had strategic reasons to keep the judge, as in Davis's case. *Id.* *Nuhfer* itself followed *Strickland* and did not apply an irrebuttable presumption, so the Ohio Court of Appeals' reliance on, and quotation of, *Nuhfer* cannot show application of an irrebuttable presumption.

Davis's claim fails on AEDPA review because it is not clearly established that a judge's prior involvement in the prosecution of a defendant's family member creates "an impermissible risk of actual bias" in the defendant's case. *See Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016). Davis asserts that, even if there is no evidence in the record of actual bias, "the probability of

actual bias on the part of [Judge Nastoff] [was] too high to be constitutionally tolerable." CA6 R. 53, Suppl. Appellee Br., at 19 (quoting *Withrow*, 421 U.S. at 47). Davis relies on *Williams v. Pennsylvania* for the proposition that Judge Nastoff had an improper motive to sentence Davis to death. But his reliance on *Williams v. Pennsylvania* is misplaced. The Supreme Court has never "required recusal as a matter of course when a judge has had prior involvement with a defendant in his role as a prosecutor"—let alone a defendant's nephew. *Isom v. Arkansas*, 140 S. Ct. 342, 343 (2019) (mem.) (statement of Sotomayor, J.). The Court in *Williams* held there was an "unacceptable risk of actual bias" in the Pennsylvania Supreme Court's denial of a postconviction motion where the chief justice had "significant, personal involvement in a critical decision in" the defendant's case. 579 U.S. at 14. But participation in a defendant's own case differs from participation in a family member's case. Judge Nastoff did not have "significant, personal involvement in a critical decision" in Davis's case; he had previously prosecuted Davis's nephew for a separate criminal offense that bore no connection to the instant murder. *Id.* Davis nevertheless claims that then-prosecutor Nastoff "heard and cross examined some of the very same mitigation evidence that Davis presented in his case." CA6 R. 20, Appellant Br., at 54 (quoting DE 4-46, Expert Aff., Page ID 6279). But Davis has never identified the alleged overlapping evidence between Davis's and Thompson's trials. True, Carol Smith, who is Davis's sister and Thompson's mother, testified at Davis's sentencing hearing, but first, she testified about matters unrelated to Thompson and his upbringing, and second, she did not testify at Thompson's mitigation trial. Davis cannot rely on this tenuous connection to show bias. We therefore accord the Ohio Court of Appeals' decision AEDPA deference and deny Davis's claim for relief.

D.

Davis also argues that his 2009 resentencing counsel were ineffective by failing to reasonably prepare and present mitigation evidence, specifically (1) by promising the panel that Ohio Parole Board Chair Cynthia Mausser would testify that Davis would never receive parole if given a life sentence, (2) by presenting Mausser's testimony, and (3) by failing to revise testimony by Robert Smith, Ph.D., a clinical psychologist, in view of Mausser's testimony.

The Ohio Court of Appeals, providing the last reasoned state court decision on this issue, found that counsel made reasonable strategic decisions to call and question Mausser and Smith and thus denied Davis's ineffective assistance of counsel claim. *Davis*, 2013 WL 4806935, at *5. Davis again argues that the Ohio Court of Appeals' decision involved an unreasonable application of *Strickland* by applying an irrebuttable presumption of sound trial strategy. We disagree.

The Ohio Court of Appeals first stated that the "decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *Id.* (quoting *State v. Johnson*, No. CA2011-09-169, 2013 WL 938598, at *10 (Ohio Ct. App. Mar. 11, 2013)). *State v. Johnson*, the case from which the Ohio Court of Appeals quoted, itself did not apply an irrebuttable presumption but rather concluded that trial counsel's decision not to call a witness was sound trial strategy where the defendant had failed to carry his burden to overcome that presumption. *See* 2013 WL 938598, at *10 (noting that the defendant had failed to specify what the witness would have said or how the witness's testimony would have aided his defense). Where Davis had not overcome the presumption of sound trial strategy, the Ohio Court of Appeals in hindsight could not second guess the decision to call Mausser. This conclusion tracks *Strickland*. *See* 466 U.S. at 689.

The Ohio Court of Appeals next concluded that "counsel's strategic decision to engage, or not engage, in a particular line of questioning" was "presumed to be the product of sound trial strategy." *Davis*, 2013 WL 4806935, at *5. Again, this is a rough paraphrase of *Strickland*, not an unreasonable application of it. *See Strickland*, 466 U.S. at 689–90. The Ohio Court of Appeals stated that it was applying a "presum[ption]," not an irrebuttable one. *Davis*, 2013 WL 4806935, at *5. And it is clear from the court's decision that it did not find Davis had rebutted the presumption of sound trial strategy. The Ohio Court of Appeals concluded that "[t]he fact that the trial strategy was ultimately unsuccessful or that there was another possible and better strategy available does not amount to ineffective assistance of counsel." *Id.* (quoting *State v. Murphy*, No. CA2009-05-128, 2009 WL 4896231, at *5 (Ohio Ct. App. Dec. 21, 2009)). This proposition is consistent with *Strickland*'s pronouncement that deficient performance requires "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by

the Sixth Amendment." *Strickland*, 466 U.S. at 687. The Ohio Court of Appeals was well within *Strickland*'s scope when it found that counsel's strategy of calling Mausser and questioning Smith, while perhaps not the best strategy, was not deficient performance.

When AEDPA deference applies to an ineffective assistance of counsel claim, "[t]he question is whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105 (emphasis added); *see id.* (explaining that when *Strickland* and AEDPA apply in tandem, reviewing courts must accord double deference). Davis asserts counsel were ineffective in calling Mausser as a witness, despite being on notice that her testimony may not be as promised. But there is a reasonable argument that counsel satisfied *Strickland*'s deferential standard. At the sentencing hearing, counsel explained that they had interviewed Mausser four months before the hearing and based their strategy on how they thought she would testify. This shows at least some prior investigation. *See Strickland*, 466 U.S. at 690–91. When the prosecution asserted that Mausser would not testify as the defense believed, defense counsel were so confident that the prosecution was incorrect that they were ready to testify under oath "that that is not what we were told." DE 5-7, Mitigation Hr'g Tr., Page ID 8327. Given the defense's prior interview with Mausser, as well as their apparent confidence in her testimony based on that interview, there is a reasonable argument that counsel's conduct fell "within the wide range of reasonable professional assistance" and that they were functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687, 689. Because there is room for fairminded disagreement about the application of *Strickland* to this case, Davis's claim fails. *See Richter*, 562 U.S. at 103.

There is also a reasonable argument supporting defense counsel's decision to call and question Dr. Smith, even in light of Mausser's testimony. *See id.* at 105. True, Smith's testimony that Davis thrived in a structured environment like prison due to his borderline personality disorder rested on the key assumption that Davis would remain in prison for the rest of his life. But Mausser's testimony did not conclusively establish that Davis would be released on a life sentence. Although speculative, Mausser's testimony was that Davis would likely not be paroled before the end of his natural life. There is thus a reasonable argument that counsel's

decision to call Dr. Smith folded into a sound trial strategy and was within the wide range of reasonable professional assistance.  *See id.*; *Strickland*, 466 U.S. at 689.

Even if Davis could overcome the double deference accorded to the state court's decision, Davis's claim would fail on the prejudice prong.  *See Rayner*, 685 F.3d at 638 (prescribing de novo review for unadjudicated *Strickland* prongs).  In the context of a death sentence, a defendant proves prejudice if "there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Strickland*, 466 U.S. at 695.  Davis cannot show prejudice because the Ohio Supreme Court's independent review, which gave weight to the "likelihood that Davis will never be released from prison" given his age, cured any error.  *See Davis*, 9 N.E.3d at 1056; *see also Lundgren v. Mitchell*, 440 F.3d 754, 783 (6th Cir. 2006) (acknowledging that independent reweighing by the Ohio Supreme Court under Ohio Rev. Code § 2929.05(A) can cure error in weighing factors).  The Ohio Supreme Court thus came to the conclusion that Davis sought— that his parole was unlikely—even if Mausser's testimony did not accomplish that objective.  This conclusion defeats any reasonable probability that, absent the purported error, a sentencer would have weighed the aggravating and mitigating circumstances to a different result.  *Strickland*, 466 U.S. at 694.

Nor was Davis prejudiced by Smith's testimony.  The Ohio Supreme Court, in conducting its independent reweighing, found Smith's testimony about Davis's borderline personality disorder unpersuasive because the murder at issue "was not an impulsive act or the product of an angry outburst," but rather a killing "with prior calculation and design," where Davis had organized a straw purchaser to acquire a gun and ammunition earlier that day.  *Davis*, 9 N.E.3d at 1055.  In other words, even if Davis were to be later released on parole, the problem was not impulsive behavior.  This independent reweighing cured any purported error in failing to elicit Smith's testimony about Davis's behavior if eventually paroled.  *See Lundgren*, 440 F.3d at 783.  We thus accord the Ohio Court of Appeals the deference owed under AEDPA and reject the claim.

E.

Davis next argues that his 2009 resentencing counsel were constitutionally ineffective for failing to investigate and present mitigating evidence—specifically, a letter from Robert J. Beard—concerning the circumstances of Davis's 1971 conviction of second-degree murder. Several years after that conviction, a man named Robert J. Beard wrote a letter to H.J. Bressler, Davis's trial counsel in the 1971 murder case, stating that Beard had been in the house when Ernestine was killed and that Ernestine's death was the result of a heated dispute in which she was the aggressor. *Davis*, 1996 WL 551432, at *4. Beard's "letter was time-stamped for the record by the clerk's office in 1981," thus preceding the 1983 murder. *Id.*

While Davis used the letter to move for a new trial challenging his 1971 conviction, Davis did not raise an ineffective assistance of counsel claim for failure to investigate and present the letter on direct appeal of his 1984 conviction. *Id.* Instead, Davis raised this claim for the first time in his post-conviction petition following his second sentencing. At that time, the Ohio Court of Appeals barred Davis's claim under res judicata because Davis had not raised it on direct appeal, even though he could have. *Id.*

Davis did not raise this claim in his state post-conviction proceedings following his third sentencing in 2009. The Warden argues that Davis thus did not satisfy the exhaustion requirement. Davis argues that, because the Sixth Circuit's decision in *Davis v. Coyle* granted relief only as to his sentence, his conviction was left in place, and thus he properly exhausted this claim by presenting it to the state courts in his postconviction petition following his second sentencing. But the problem with this position is that Davis was represented by different counsel at his second sentencing versus his third. Davis's briefing before this court focuses exclusively on the new counsel's alleged deficiencies at his third sentencing hearing by not investigating or presenting the letter as mitigating evidence. Davis thus never "fairly presented" his claim, as he never presented the factual basis for the deficiency of his new attorney at his third sentencing to the Ohio state courts. *See Wagner*, 581 F.3d at 414–15. Davis's claim of error is procedurally defaulted. *See Gray v. Netherland*, 518 U.S. 152, 161–62 (1996).

F.

Finally, Davis argues that his original trial counsel in 1984 were ineffective by failing to advise him of the collateral consequences of waiving his constitutional right to a jury trial.[3] The Warden contends that this claim is procedurally defaulted because the Ohio Court of Appeals invoked a procedural bar instead of considering this claim on the merits. *See Davis*, 2013 WL 4806935, at \*7 (explaining that "as this court has previously determined, Davis'[s] habitual challenges regarding his jury waiver are barred by the doctrine of res judicata"). Thus, review by this court would be barred because "the state judgment rests on independent and adequate state procedural grounds." *Coleman v. Thompson*, 501 U.S. 722, 730 (1991).

The parties dispute whether Ohio correctly applied its res judicata rule. In all events, even on de novo review, Davis's ineffective assistance of counsel claim fails. Davis relies on *Padilla v. Kentucky*, 559 U.S. 356 (2010), for the contention that his 1984 trial counsel were ineffective. Davis's reliance on *Padilla* is misplaced because the Supreme Court has held that *Padilla* does not have retroactive effect. *Chaidez v. United States*, 568 U.S. 342, 344 (2013). Moreover, the timing here is critical. The Supreme Court has held that deficient performance is judged based on the prevailing professional norms at the time of trial. *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (per curiam) ("Judging counsel's conduct in the 1980's on the basis of these 2003 Guidelines—without even pausing to consider whether they reflected the prevailing professional practice at the time of the trial—was error."). In 1984, the prevailing professional norms did not require attorneys to inform clients of the collateral consequences of waiving a constitutional right. *See Chaidez*, 568 U.S. at 350. Davis has thus not shown deficient performance.

---

[3]Specifically, Davis argues that counsel did not inform him of the negative impact that a jury waiver would have on appellate review, did not explain that the jury waiver could not be retracted at a later guilt or penalty phase regardless of the three-judge panel, did not reserve the right to withdraw the waiver, and advised Davis to waive his right to a jury trial knowing that he would likely be sentenced to death because his innocence defense prevented him from accepting responsibility.

IV.

For the reasons discussed above, we deny Davis's claims for habeas relief. In the habeas context, federal courts may not displace with their own judgment the valid adjudications of state courts.

—————————————

**DISSENT**

—————————————

KAREN NELSON MOORE, Circuit Judge, dissenting. In 1984, Von Clark Davis was sentenced to death by a three-judge panel. Since that time, Davis's death sentence has been vacated twice—once by the state courts and once by a panel of this court. Before his third resentencing, Davis unsuccessfully attempted to withdraw his 1984 jury waiver because the three-judge panel explicitly named in the waiver was no longer available. The new state resentencing panel denied this request, Davis presented his mitigation case, and the new panel again sentenced Davis to death.

Today, the Majority finds both that Davis must be held to his 1984 jury waiver and that the waiver was knowing and voluntary, despite the fact that the promise that induced Davis's waiver is not being enforced. Excising the promise of the named three-judge panel from the jury waiver, the Majority enforces the waiver against Davis while simultaneously holding that the aspect of the waiver that benefits Davis is not enforceable. At bottom, the Majority creates a rule that allows death-eligible defendants to be induced to waive their constitutional right to a jury trial by unenforceable promises, leaving these individuals with no recourse to vindicate their constitutional rights. This plainly contradicts binding Supreme Court precedent. Likewise, the Majority finds that the state court properly applied *Strickland*'s presumption to counsel's failure to move for recusal and decision to present incomplete mitigating evidence, even though the state court *never assessed* the adequacy of counsel's investigation and preparation. This, too, conflicts with longstanding Supreme Court precedent. I therefore respectfully dissent.

**I. DISCUSSION**

Davis raises six bases for relief. In my view, Davis is entitled to relief on four bases: (1) his claim that his jury waiver was breached when he was forced to be resentenced before a different three-judge panel (the "Breach Claim"); (2) his claim that his jury waiver was not

knowing, intelligent, and voluntary (the "Unknowing-Waiver Claim");[1] (3) his claim that his counsel were ineffective for failing to move for Judge Nastoff's recusal (the "Recusal Claim"); and (4) his claim that his counsel were ineffective for failing adequately to investigate, prepare for, and present mitigating evidence (the "Failure-to-Investigate Claim"). I will address each claim in turn.

## A. The Breach Claim

Davis argues that his jury waiver was breached because he did not receive the benefit of the bargain when he was resentenced before a different three-judge panel than the one specified in his jury waiver. D. 53 (Appellant Suppl. Br. at 3–9). In response, the Warden contends that Davis procedurally defaulted this claim, and, in the alternative, the state court's denial of this claim was reasonable. D. 54 (Appellee Suppl. Br. at 5–11). Although the Majority claims not to resolve the procedural-default question, Maj. Op. at 8–9, its acknowledgment that the Supreme Court of Ohio did not dismiss this claim on procedural grounds coupled with its subsequent reliance on Davis's briefing, Davis's oral argument, and the Supreme Court of Ohio's opinion leads to one conclusion: the Breach Claim was properly exhausted. *See Jones v. Bradshaw*, 46 F.4th 459, 484 (6th Cir. 2022) (explaining that procedural default applies only when "the state courts actually enforced the state procedural sanction" (citation omitted)). Accordingly, I proceed to assess whether AEDPA deference applies and whether Davis is entitled to relief on his Breach Claim.

### 1. AEDPA Deference

Because the Supreme Court of Ohio did not cite the relevant U.S. Supreme Court standard, rely on an analogous state-law standard, or analyze Davis's Breach Claim, I would find that AEDPA deference does not apply. *Lafler v. Cooper*, 566 U.S. 156, 173 (2012) (holding that AEDPA deference did not apply because the state court determined that the defendant's plea was knowing and voluntary without considering whether counsel was ineffective under *Strickland*).

---

[1]Davis cannot be granted relief simultaneously on both the Breach Claim and the Unknowing-Waiver Claim. At a high level the argument is: either the jury waiver included an enforceable contractual term—the specific three judges—that was breached, or that term was an unenforceable promise that induced Davis's waiver, thereby making the waiver unknowing. Rather than take a position on which claim should succeed, I assess each claim independently and find that they each warrant relief.

Specifically, under the sub-heading "Constitutionality," the Supreme Court of Ohio considered Davis's Unknowing-Waiver Claim only. *See State v. Davis*, 9 N.E.3d 1031, 1042–43 (Ohio 2014) (*Davis XIV*).**2** The court concluded that Davis did not have a constitutional right to jury sentencing under *Spaziano v. Florida*, 468 U.S. 447 (1984), and that it therefore did not need to determine whether the waiver was knowing and voluntary. *Davis XIV*, 9 N.E.3d at 1042. In the alternative, the court found that Davis's argument failed because it "appear[ed] to require that a defendant . . . possess more information than courts have usually held sufficient" for a knowing and voluntary waiver. *Id.* Finally, the court determined that *Duncan v. Louisiana*, 391 U.S. 145 (1968), did not alter its analysis. *Id.* at 1043. At bottom, the state court never considered the constitutional implications of holding Davis to the waiver of his constitutional right to a jury during the *guilt phase* that was induced by an explicit promise—that he would be tried *and sentenced* before a specific panel**3**—that could not be fulfilled. *See id.* at 1042–43.

By concluding that that AEDPA deference applies to Davis's Breach Claim because the state court presumptively adjudicated this claim on its merits, *see* Maj. Op. at 10–11, the

---

**2** In the preceding section of the opinion, the Ohio Supreme Court assessed the applicability of the Ohio death-penalty statute. *Davis XIV*, 9 N.E.3d at 1041–42. This cannot be considered an assessment of the merits of Davis's Breach Claim because it is explicitly not a constitutional analysis and it does not invoke the relevant federal standard or an analogous state standard.

**3**The Majority contends that Davis's jury waiver—within its "four corners"—does not mention sentencing and therefore the waiver did not include a promise that the three-judge panel would preside over sentencing, Maj. Op. at 15–16; however, this argument ignores generally applicable Ohio jury-waiver law. Specifically, "[a]s [the Ohio courts] h[ave] previously recognized, [Ohio Revised Code §] 2929.03(C)(2)(b) states that once a defendant waives his right to a jury trial, that waiver applies to the penalty proceeding as well." *State v. Davis*, No. CA2009-10-263, 2011 WL 646404, at *7 (Ohio Ct. App. Feb. 22, 2011) (*Davis XI*). The three-judge panel thus presides over both trial and sentencing. *See* Ohio Rev. Code § 2929.03(C)(2)(b)(i)–(ii) (stating that a penalty imposed under § 2929.03(D)—including the death penalty—"shall be determined by . . . the panel of three judges that tried the offender upon the offender's waiver of the right to trial by jury"). Accordingly, without any jury-waiver language to the contrary, there is no basis to conclude that the waiver's use of the word "trial" was intended to alter generally applicable Ohio jury-waiver law.

Indeed, this straightforward interpretation of the jury waiver in light of the generally applicable law was reinforced during Davis's colloquy and was even the basis of the state courts' later determinations that Davis's waiver was knowing and voluntary. *See* R. 5-1 (Tr. of 1984 Mot. Hr'g at 60–61) (Page ID #7224–25) (explaining during the waiver colloquy that the jury waiver would shift decision making from a jury to a three-judge panel and clarifying that "it goes to all phases" of the trial); R. 4-37 (Dec. 29, 2008 Order at 15) (Page ID #4648) ("As the record shows, all were aware, including Defendant, that a jury waiver applied to both phases of trial, and that a three judge panel would determine Defendant's sentence should the need arise."); *Davis XI*, 2011 WL 646404, at *7 (concluding that "Davis was aware that by waiving his right to a jury, he was giving up that right for both the guilt phase of the trial, as well as the sentencing proceeding"). It is only now, because the plain language and most obvious interpretation of the jury waiver does not support the Majority's argument, that the waiver no longer applies to the sentencing phase.

Majority flouts the reasoning of *Johnson v. Williams*, 568 U.S. 289 (2013). In *Williams*, the petitioner brought claims under the Sixth Amendment and the California Penal Code based on the trial court's decision to excuse a juror. 568 U.S. at 295. The California Court of Appeals denied the petitioner's claims and, although the state court "did not expressly acknowledge" the Sixth Amendment claim, it relied on Supreme Court precedent concerning the Sixth Amendment. *Id.* at 296. On federal habeas review, the Supreme Court held that AEDPA deference applied, and federal courts should presume that, in situations such as Williams's, the Sixth Amendment claim had been adjudicated on the merits. *Id.* at 298.

The Court cautioned that, although there is "a strong . . . presumption" that the state court adjudicated issues on the merits, the presumption is rebuttable. *Id.* at 301. The Court stated that it would "go[] too far," if the presumption applied when "a defendant claimed in state court that something that occurred at trial violated both a provision of the Federal Constitution and a related provision of state law, and . . . in denying relief, [the state court] made no reference to federal law." *Id.* Likewise, the Court explained that the presumption would be rebutted in several circumstances, including if the petitioner invokes both the state and federal constitutions but "the state standard is quite different from the federal standard" and the state court does not explicitly resolve the federal claim. *Id.*

That is precisely the case here. Davis invoked two interrelated claims—the same that we address here—arising under the Federal Constitution: that his jury waiver was breached and that his jury waiver was not knowing and voluntary. The federal standard for determining whether a waiver is knowing, intelligent, and voluntary is "quite different" from the federal standard for determining whether there was a breach of the jury waiver. *Id.* This is plain from the Majority's separate analysis of each claim. Notably, the Supreme Court of Ohio did not cite any federal precedent or analogous state precedent relevant to adjudicating Davis's Breach Claim on its merits. *Davis*, 9 N.E.3d at 1042–43. Thus, this case falls squarely within the circumstances in which the presumption is rebutted, as contemplated by *Williams* because the standards applied by the Supreme Court of Ohio do not encapsulate—or even relate to—the standards relevant to Davis's Breach Claim. *See* 568 U.S. at 301–02.

The Majority contends that "a state court's unexplained denial of a federal claim is presumed to constitute an adjudication on the merits." Maj. Op. at 10 (citing *Harrington v. Richter*, 562 U.S. 86, 98, 102 (2016)). But the cited portion of *Richter* establishes that the state court need not *explain* a decision, not that the state court can simply *ignore* a non-frivolous claim. 562 U.S. at 98, 102 (considering "whether § 2254(d) applies when a state court's order is unaccompanied by an opinion explaining its reasons" and then holding that § 2254(d) does not "require that there be an opinion from the state court explaining the state court's reasoning" but that the statute does require a "decision"). As the Court explained in *Williams*, if there is a written statement of reasons, the presumption of adjudication on the merits is rebutted when, as here, "a defendant claimed in state court that something that occurred at trial violated both a provision of the Federal Constitution and a related provision of state law, and . . . in denying relief, [the state court] made no reference to federal law." 568 U.S. at 301.

The Majority also suggests that the Supreme Court of Ohio "may have regarded" the Breach Claim "as too insubstantial to merit discussion." Maj. Op. at 11 (quotations omitted). Yet, the Majority's subsequent five-page analysis of the Breach Claim contradicts its contention that this claim is also somehow "insubstantial." *Id.* at 11–16. And the Majority relies on a mischaracterization of *Williams* and *Rogers v. Mays*, 69 F.4th 381 (6th Cir. 2023) (en banc), for the proposition that Davis was required to move for reconsideration. Unlike Williams's failure to "argue[] in the subsequent state and federal proceedings that the state court had failed to adjudicate her . . . claim on the merits," 568 U.S. at 306, Davis has repeatedly argued in subsequent proceedings that his Breach Claim was not adjudicated on its merits. *See* D. 53 (Appellant Suppl. Br. at 6–7); D. 59 (Appellant Suppl. Reply Br. at 1–2); D. 20 (Appellant Br. at 40) (arguing that "the court did not address whether it was a violation of fundamental fairness to hold Davis to a jury waiver in violation of its explicit terms").[4] Because both *Rogers* and *Williams* relied on the petitioner's failure to raise the argument altogether, today the Majority suggests that petitioners must also move for reconsideration—a clearly improper expansion of this procedural hurdle. With no state-court analysis resolving the Breach Claim or even a

---

[4]This same distinction is also apparent in *Rogers* because, unlike Davis, Rogers "concede[d] that the state court adjudicated his claim" and "in both his original and supplemental briefs before [the en banc] court, he admitted that the state court addressed this claim on the merits." 69 F.4th at 388 (quotations omitted).

passing citation to the relevant legal standard in the state-court opinion, the Majority "goes too far" in applying AEDPA deference to a non-frivolous claim. *Williams*, 568 U.S. at 301. Thus, I would find that the Breach Claim is subject to de novo analysis.

## 2. Merits

Even if AEDPA deference applies, Davis is entitled to relief on his Breach Claim because the Supreme Court of Ohio's decision is an unreasonable application of Supreme Court precedent. Davis claims that his rights under the Due Process Clause and the Sixth and Eighth Amendments were violated when his 1984 jury waiver was enforced against him at his third sentencing hearing in 2009 because the state did not comply with the plain terms of the waiver agreement, which included a promise that the three named judges would try and sentence him.[5]

To determine whether the enforcement of Davis's waiver was valid, I am guided by the Supreme Court's instruction that, because "the right of jury trial is fundamental, courts indulge every reasonable presumption against waiver." *Aetna Ins. Co. v. Kennedy to Use of Bogash*, 301 U.S. 389, 393 (1937). The Supreme Court has held that written waivers of constitutional trial rights "are essentially contracts," "[a]lthough the analogy may not hold in all respects." *Puckett v. United States*, 556 U.S. 129, 137 (2009). "When the consideration for a contract fails—that is, when one of the exchanged promises is not kept—. . . the contract was broken" and "[t]he party injured by the breach will generally be entitled to some remedy, which might include the right to rescind the contract entirely." *Id.* Because the waiver of a constitutional right is involved, a breach of a jury waiver has constitutional dimensions. *See United States v. Barnes*, 278 F.3d 644, 648 (6th Cir. 2002).[6] Specifically, "a defendant has a due process right to hold the government to the promises it made that induced him to" waive the right. *United States*

---

[5]Confusingly, the Majority dedicates two pages to responding to an argument that no one advocates before the en banc court and, indeed, that Davis expressly *disclaimed*. Maj. Op. at 12–13 (noting that Davis agrees "that there is no constitutional right to jury sentencing and that his only claimed constitutional right to being sentenced by the three named judges stems from his bargain theory" and then proceeding to analyze whether there is a constitutional right to jury sentencing). Because this argument is irrelevant and not properly before this court, I decline to address it.

[6]"Although courts of appeals decisions do not create clearly established law for AEDPA purposes, we may look to such decisions to evaluate whether the Supreme Court has clearly established a principle." Maj. Op. at 23 n.2 (citing *Avery v. Prelesnik*, 548 F.3d 434, 436–37 (6th Cir. 2008)).

*v. Warren*, 8 F.4th 444, 448 (6th Cir. 2021) (citing *Santobello v. New York*, 404 U.S. 257, 262 (1971)).  It therefore follows that Davis has the right to receive the benefit of the jury waiver or, in the alternative, to withdraw his waiver.  *Cf. Sinistaj v. Burt*, 66 F.3d 804, 809 (6th Cir. 1995) (denying analogous habeas claim because petitioner's jury waiver did not specify that only a particular named judge could preside).

The Majority comes to the opposite conclusion by claiming that Davis relies on Supreme Court cases that are not specific enough to the facts of this case because, in the Majority's view, Davis's analogy to plea agreements is inapt.  *See* Maj. Op. at 13–14 ("Davis has not cited a Supreme Court case explaining, much less holding, that the contract principles applicable to plea bargain agreements are also applicable to jury waivers.").[7]  In an effort to distinguish Davis's written jury waiver from written plea agreements, the Majority begins by suggesting that "Defendants routinely waive constitutional rights *without inducements*, such as waiving the right to remain silent when being questioned by a police officer, waiving the right to representation by counsel, or pleading guilty without a plea deal."  Maj. Op. at 14 (emphasis added) (citations omitted).[8]  But Davis *was induced* to waive his jury right based on the availability of a specific three-judge panel.  Davis filed a pre-trial motion for notice of the three judges that would preside over his trial if he decided to waive his jury right.  R. 4-1 (Mot. for Notice of Panel at 1–2) (Page ID #212–13).  In the motion, Davis stated that he wanted this information before he could "make a valid, fully informed decision as to whether or not he should waive his right to trial by jury." *Id.* at 2 (Page ID #213).  The court was not required to provide Davis with the requested information; however, the court was required to provide accurate information.  At a pre-trial motion hearing, Judge Bruewer addressed the motion, stating "[f]or the record" and "so [the court] can inform Mr. Davis of [this] fact," "you know the three judges would be the ones that

---

[7]Despite taking great pains to distance Davis's written jury waiver from a contract—specifically a plea agreement—the Majority nonetheless applies contract principles when those principles support its argument.  Maj. Op. at 15–16 (applying the "four corners" doctrine in an effort to ignore the plea colloquy that indicates the jury waiver applies to guilt and sentencing).

[8]Waiving the right to remain silent when being questioned by a police officer is legally distinct from a court accepting an individual's decision to waive a constitutional right in court.  *See Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010) ("*Miranda* rights can . . . be waived through means less formal than a typical waiver on the record in a courtroom, given the practical constraints and necessities of interrogation and the fact that *Miranda*'s main protection lies in advising defendants of their rights." (citations omitted)).  This comparison is therefore fundamentally inapt.

are here in the General Division, it would be Judge Stitsinger, Judge Moser and myself." R. 5-1 (Tr. of 1984 Mot. Hr'g at 34, 42) (Page ID #7201, 7209). It was only after receiving this information that Davis signed the jury-waiver form that included the specific names of the three judges who would preside. R. 4-3 (Jury Waiver at 1) (Page ID #433). Thus, the Majority's suggestion that Davis's jury waiver came without inducement is plainly contradicted by the record.

Davis's jury waiver is also distinct from the Majority's proffered examples because his jury waiver was more formal.[9] As explained, here there was a written jury waiver with an explicit promise that Davis informed the court was relevant to his willingness to waive his jury right. The waiver was prepared by the prosecutor, signed by the court, the defendant, and defense counsel, and, after an on-the-record colloquy, accepted by the court. *See* R. 5-1 (Tr. of 1984 Mot. Hr'g at 34, 42) (Page ID #7201, 7209); R. 4-3 (Jury Waiver at 1) (Page ID #433); R. 5-1 (Tr. of 1984 Waiver Colloquy at 58–62) (Page ID #7222–26). The jury waiver in this case is therefore much more analogous to a written plea agreement that is signed by the defendant, defense counsel, and the government, subject to an on-the-record colloquy, and accepted by a court before it becomes valid. *See generally* Ohio Rev. Code Ann. § 2945.05 (requiring that a jury waiver must be "in writing, signed by the defendant, and filed in" the record and "must be made in open court"); *see also Fitzgerald v. Withrow*, 292 F.3d 500, 503 (6th Cir. 2002) (explaining that courts "have required elaborate conditions for [a jury] waiver to be valid"). Courts treat plea agreements with such formality because defendants are waiving their constitutional right to a jury trial. *See Brady v. United States*, 397 U.S. 742, 748 (1970).

---

[9]Even if Davis's written jury waiver could be considered properly analogous to an unwritten plea agreement, waiving the right to counsel, or waiving *Miranda* rights, promises that induce these categories of waivers—like Davis's jury waiver—must be enforceable. For example, if a defendant was induced to plead guilty by an explicit promise but without a written contract, this would be discussed during the on-the-record colloquy required when the court accepted the plea agreement. *See Santobello*, 404 U.S. at 261–62. Likewise, defendants who waive the right to counsel do so after an on-the-record colloquy that is "more" formal than a plea colloquy to ensure that the waiver was not induced by unenforceable promises. *See Iowa v. Tovar*, 541 U.S. 77, 87–88, 90–91 (2004) ("While the Constitution does not force a lawyer upon a defendant, it does require that any waiver of the right to counsel be knowing, voluntary, and intelligent." (internal quotation marks omitted)). Finally, in the context of choosing to speak with officers, when the validity of a *Miranda* waiver is at issue, courts consider whether there was an illusory promise that induced the individual to waive their rights. *See United States v. Johnson*, 351 F.3d 254, 257, 260–63 (6th Cir. 2003) (considering whether Johnson's waiver of *Miranda* rights was unknowing or involuntary because the waiver was induced by the verbal promise of leniency). This is the very basis of knowing and voluntary waivers.

Thus, just as with plea agreements, before a court can accept a defendant's jury waiver, it is required to ensure that the waiver is "voluntary and knowing and if it was induced by promises, the essence of those promises must in some way be made known." *Santobello*, 404 U.S. at 261–62; *cf.* Fed. R. Crim. P. 11(b)(2) ("[T]he court must address the defendant personally in open court and determine that the plea is voluntary and did not result from . . . promises (other than promises in the plea agreement)."). If there are any promises "that . . . can be said to be part of the inducement or consideration, such promise[s] *must be fulfilled*." *Santobello*, 404 U.S. at 262 (emphasis added).

In this case, the promise of a specific three-judge panel was put on the record by Davis's motion requesting the judges' names, the court identifying the judges' names in response to that motion, the written plea agreement (drafted on state letterhead and signed by the defendant, defense counsel, and the court), and the court's waiver colloquy that acknowledged and reaffirmed the specific three judges. When the state court accepted the waiver on this record, it accepted that Davis had been induced to waive his jury right based on the promise that he would be tried and sentenced by three specific judges. Once the waiver was accepted based on the explicit promise of the named three judges, the promise "must be fulfilled" or, if that is not possible, Davis is entitled to relief for the breach. *See Santobello*, 404 U.S. at 262; *Puckett*, 556 U.S. at 137.

To further distance Davis's written jury waiver from written plea agreements, the Majority asserts that the jury waiver was not bargained-for for three interrelated reasons: (1) Davis was able unilaterally to withdraw his waiver, (2) there is a statutory procedure for designating the judges for the panel, and (3) "the court had no discretion to refuse [Davis's] choice" to waive his jury right. Maj. Op. at 14. But this reasoning is either inapt, incorrect, or irrelevant. First, although Ohio law does allow a defendant to withdraw a jury waiver up until the point of trial, once the guilt phase began Davis was bound by his waiver. *See* Ohio Rev. Code Ann. § 2945.05. Indeed, this was the basis of the state's opposition to—and the state court's rejections of—Davis's repeated requests to withdraw his jury waiver for resentencing. *See, e.g.*, R. 5-6 (Tr. of 2008 Mot. Hr'g at 53–58) (Page ID #8068–73) (arguing that Davis's jury waiver remains valid at resentencing and opposing Davis's attempts to invalidate or withdraw it).

Accordingly, it is not clear how it is relevant that, for a brief period, Davis could have withdrawn his waiver. Once that period expired, Davis was bound by the waiver as if it were a contract so long as his conviction remained intact. *See* Ohio Rev. Code Ann. § 2945.05; R. 4-37 (Dec. 29, 2008 Order at 20–21) (Page ID #4653–54). This aspect of Ohio procedural law does not make the waiver any less bargained-for. It is similarly irrelevant that there is a statutory procedure for designating the judges and that these were the only three judges in the relevant division because certain issues, such as illness, scheduling conflicts, or a conflict of interest, could lead to the appointment of a judge outside of the typical procedure. Although there may have been a "typical" procedure, Davis nonetheless received a promise that three specific judges would preside over his case and sentencing.

Finally, the Majority's contention that the trial court "had no discretion to refuse" Davis's waiver has no support in the relevant law. Maj. Op. at 14. It is correct that defendants have a *statutory* right to waive their jury right. *See* Ohio Rev. Code § 2945.05; *State v. Banks*, 151 N.E.3d 198, 201 (Ohio Ct. App. 2019) (explaining that a defendant's jury waiver must be accepted if the court "strictly compl[ies] with the five requirements of . . . § 2945.05" (quotations omitted)). It is not the case, however, that the trial court could simply ignore any potential federal constitutional implications of the jury waiver. *See, e.g.*, *State v. Van Sickle*, 629 N.E.2d 39, 43–44 (Ohio Ct. App. 1993) (explaining that the trial court has no discretion to reject a defendant's jury waiver "unless suggestion of his present insanity is made" (quotations omitted)). The court must be certain that the jury waiver was made knowingly, intelligently, and voluntarily. *Santobello*, 404 U.S. at 261–62; *Brady*, 397 U.S. at 748. If there is reason to doubt that the waiver is knowing, intelligent, or voluntary, the trial court was *obligated* to reject it. *See Brady*, 397 U.S. at 748 (explaining that "a guilty plea is a grave and solemn act to be accepted only with care and discernment"). Stated differently, if, as the Majority contends, "the defendant does not have a say in the judges that make up the panel" and thus "Davis did not 'bargain' with the state for the three specific judges," Maj. Op. at 15, then the court was *obligated* to reject his jury waiver because it was improperly induced. *See infra* Part II.C. Instead, the court accepted the jury waiver, and Davis was therefore owed the promise of the specific three-judge panel or, given the judges' unavailability at resentencing, the ability to withdraw his waiver. *Santobello*, 404 U.S. at 262.

Perhaps sensing the inadequacy of its argument that the express terms of the jury waiver did not bind the trial court at resentencing, the Majority suggests that because the provision providing for a specific three-judge panel is unusual, that it could not have created any obligations. Maj. Op. at 15 (noting that Davis did not "identify a case in which a plea deal or waiver contains [a similar] commitment" and concluding that, therefore, "the terms of the waiver here are insufficient to create such an unusual bargain"). But the unusual nature of the express terms of the jury waiver *reinforces* the conclusion that the specific judges were bargained-for. If all the usual rules of Ohio statutory procedure applied, there would be *no reason* to include any reference to the three-judge panel in the jury waiver. Instead, the only reason Davis—and defense counsel, the state, and the trial court—included such a provision was to create a situation in which the general rules did not apply. In concluding otherwise, the Majority improperly excises the three-judge-panel term from the jury waiver. *Cf. Warren*, 8 F.4th at 448 ("[W]e enforce [plea agreements] *according to their literal terms*" because "defendants waive[] certain fundamental rights when they enter plea agreements" (quotations omitted) (emphasis added)).

In a last-ditch effort to shore up its conclusion, the Majority claims that Davis's "closer in time" 1993 affidavit provides a basis to "disregard" his "claim that he only waived his right to a jury in return for being tried and sentenced" by the named three-judge panel. Maj. Op. at 16. But this affidavit is not closer in time than Davis's pre-trial motion, pre-trial motion hearing, and jury-waiver colloquy, all of which occurred in the lead up to trial. It is not clear why the 1993 affidavit could be considered "earlier" or "more consistent" than Davis's conduct during the trial proceedings. Moreover, "credit[ing] Davis's 1993 affidavit," the Majority provides no reason why Davis can have only one reason for electing to proceed before a three-judge panel. Davis likely took many factors into consideration when deciding whether to proceed before a jury. Thus, this is not a basis to "disregard" entirely Davis's other reasons for waiving his jury rights. Finally, the "other" reason for Davis's waiver—that Davis wanted a three-judge panel because he did not want the prior aggravating circumstance decided by a jury—was resolved before he elected to waive his right to a jury trial. Four days before Davis decided to sign the jury waiver, he elected to have the court decide the aggravating circumstance in this case. *See* R. 5-1 (Tr. of 1984 Waiver Colloquy at 56–58) (Page ID #7220–22). Thus, by the time that Davis decided to

waive his jury right, he had already received the benefit of keeping the aggravating circumstance from the jury.

At bottom, by finding that Davis's jury waiver was not breached and denying Davis his requested relief—resentencing at which he is allowed to withdraw the waiver—the Majority concludes that the jury waiver is not a contract *and* that Davis is legally bound by it.  Put differently, under the Majority's view, the jury waiver is not a contract from which Davis can benefit, but it is a contract that *can be enforced upon Davis* as to the terms that do not benefit him.  This simply cannot be the case.  Either the waiver is a "contract"—as the term is used in *Puckett*—and it was breached when Davis did not get the benefit of the specific three-judge panel, or the waiver is not a binding contract and Davis can withdraw it.  For the reasons explained, I would find that Davis is entitled to relief on his Breach Claim.

## B.  The Unknowing-Waiver Claim

As an alternative to his Breach Claim, Davis argues that his jury waiver was unknowing because it was premised on an unfulfillable promise or misinformation.  D. 53 (Appellant Suppl. Br. at 9–16).  For the reasons explained below, I would find that the last-reasoned state-court decision unreasonably applied Supreme Court precedent and Davis's claim succeeds on the merits.

### 1.  AEDPA Deference

The Ohio Supreme Court identified two primary bases for denying Davis relief, which are based on either an unreasonable application of Supreme Court precedent or an unreasonable determination of fact.  First, the Ohio Supreme Court held that Davis did not have the right to a jury trial at sentencing; therefore, it reasoned that it was irrelevant whether Davis's waiver was voluntary, knowing, and intelligent.  *Davis XIV*, 9 N.E.3d at 1042 ("[T]he requirement of a knowing and intelligent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial." (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 237 (1973)).  This reasoning fails to address that Davis waived his right to a jury during *the guilt phase of his trial* because he was promised that the specific three-

judge panel would adjudicate *both phases of the trial*.**10** R. 4-37 (Dec. 29, 2008 Order at 15) (Page ID #4648) ("As the record shows, all were aware, including Defendant, that a jury waiver applied to both phases of trial, and that a three judge panel would determine Defendant's sentence should the need arise."); R. 4-3 (Jury Waiver at 1) (Page ID #433); R. 5-1 (Tr. of 1984 Mot. Hr'g at 60–61) (Page ID #7224–25) (explaining that the jury waiver would shift decision making from a jury to a three-judge panel and clarifying that "it goes to all phases" of the trial). The Ohio Supreme Court's reasoning on this point, therefore, is an unreasonable determination of fact because it relied on an incorrect determination that Davis's jury waiver was irrelevant to the resentencing proceeding.

Alternatively, the Ohio Supreme Court reasoned that Davis's Unknowing-Waiver Claim failed because defendants are typically "sufficiently informed to make an intelligent waiver" so long as they are aware of the general parameters of a jury trial. *Davis XIV*, 9 N.E.3d at 1042. The Ohio Supreme Court, however, failed to consider the "relevant circumstances and likely consequences" specific to Davis's jury waiver, despite *Brady* and *McCann* requiring that it do so. *Brady*, 397 U.S. at 748; *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 278 (1942). Most relevant here, the Ohio Supreme Court did not consider whether Davis's jury waiver was "induced by . . . misrepresentation (including unfulfilled or unfulfillable promises)." *Brady*, 397 U.S. at 755 (citation omitted). Accordingly, this aspect of the decision constitutes an unreasonable application of Supreme Court precedent. For these reasons, I would find that the Unknowing-Waiver Claim is subject to de novo review that includes consideration of all the relevant circumstances, as required by Supreme Court precedent.

## 2. Merits

"Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady*, 397 U.S. at 748. The "relevant circumstances and likely consequences" include whether the defendant "was subjected to . . . threats or promises" and "had competent counsel and full opportunity to assess the advantages and disadvantages of trial." *Id.* at 748, 754;

---

**10**The Majority adopts this inadequate reasoning as well. *See* Maj. Op. at 17–18. Perhaps recognizing its deficiency, the Majority does not rest the opinion on this basis. *Id.* at 18–20.

*see also McCann*, 317 U.S. at 278 (explaining that determining whether a defendant's jury waiver was "intelligent, competent, [and] self-protecting . . . depend[s] upon the unique circumstances of each case"). Likewise, the waiver must be "entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel." *Brady*, 397 U.S. at 755 (quoting and adopting the standard as stated in *Shelton v. United States*, 246 F.2d 571, 572 n.2 (5th Cir. 1957) (en banc), *rev'd on other grounds*, 356 U.S. 26, 78 (1958)). A waiver is invalid if it was "induced by threats . . . , misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper . . . (e.g. bribes)." *Brady*, 397 U.S. at 755 (quotations omitted). Thus, the record must reflect that the defendant possessed a full understanding of the direct consequences such that the waiver represents a voluntary and intelligent choice among alternatives. *See North Carolina v. Alford*, 400 U.S. 25, 31 (1970).

Here, the record reflects that Davis decided to waive his jury right based on the promise of a specific three-judge panel presiding over the guilt and penalty phases of trial. Davis filed a pre-trial motion for notice of the three judges that would preside over his trial if he decided to waive his jury right. R. 4-1 (Mot. for Notice of Panel at 1–2) (Page ID #212–13). In the motion, Davis stated that he needed this information to "make a valid, fully informed decision as to whether or not he should waive his right to trial by jury." *Id.* at 2 (Page ID #213). At a pre-trial motion hearing on May 2, 1984, Judge Bruewer addressed this motion and stated "[f]or the record" "you know the three judges would be the ones that are here in the General Division, it would be Judge Stitsinger, Judge Moser and myself." R. 5-1 (Tr. of 1984 Mot. Hr'g at 34, 42) (Page ID #7201, 7209). Davis and his attorney then signed a waiver form[11] that stated, in relevant part, that Davis "voluntarily waive[d] [his] right to trial by jury and elect[ed] to be tried by a court to be composed of three judges, consisting of Judges Henry J. Bruewer, William R. Stitsinger, and John R. Moser . . . ." R. 4-3 (Jury Waiver at 1) (Page ID #433). On May 8, 1984, the parties reconvened so that the court could conduct a colloquy about Davis's intent to waive his jury rights. R. 5-1 (Tr. of 1984 Waiver Colloquy at 58–62) (Page ID #7222–26). During the colloquy, Judge Bruewer reaffirmed the identities of the three judges previously discussed and

---

[11]The waiver form is printed on the letterhead of the "Office of Prosecuting Attorney Butler County, Ohio," and was presumably typed by an employee of that office. R. 4-3 (Jury Waiver at 1) (Page ID #433).

included on the jury waiver form. *Id.* at 61 (Page ID #7225) ("[W]e'll have three judges will [sic] be here tomorrow, you know who they are, and they're in this form here[, the jury waiver]. It'll be myself and Judge Moser and Judge Stitsinger."). Judge Bruewer then accepted the jury waiver form and signed it, along with his statement that "[t]his jury waiver and election to be tried by a three-judge panel is hereby accepted and entered upon the journal of this Court." *Id.*; R. 4-3 (Jury Waiver at 1) (Page ID #433).

Unlike other cases that have addressed similar claims under *Brady*, here the record leading up to the waiver, the waiver colloquy, and the language included in the waiver all lead to the same conclusion: Davis agreed to waive his jury right based on his understanding—informed by the court, his counsel, and the written jury waiver—that he would be tried and sentenced by a specific three-judge panel. *Cf. Ray v. Curtis*, 21 F. App'x 333, 334–35 (6th Cir. 2001) (finding the defendant's jury waiver was knowing and voluntary because "[n]othing in either the written waiver or the transcript of the waiver hearing conditioned Ray's waiver on having the case heard by" a specific judge); *Fitzgerald*, 292 F.3d at 503–06 (finding the defendant's jury waiver was knowing and voluntary, despite a colloquy on the record that suggested the defendant may have understood that he would be tried before a specific judge, because the plain language of the waiver was "*a judge* of the" court and the colloquy was not sufficiently clear to override the waiver); *Sinistaj*, 66 F.3d at 809 (denying analogous due-process claim because petitioner's jury waiver stated that he agreed to be tried by "*a judge* of the . . . Court" and, therefore, did not specify that it applied only to a trial before a particular named judge). Although "a trial court need not grant a defendant's request for a bench trial at all," *Fitzgerald*, 292 F.3d at 503, where, as here, the trial court granted the defendant's request for this information and then accepted the defendant's waiver that was premised on this information, the defendant must understand the value of such a commitment, *see Brady*, 397 U.S. at 755 (explaining that the waiver must be "entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel").

The Majority attempts to sidestep the clear applicability of *Brady*. Maj. Op. at 18–20.**[12]** Although the Majority purports to apply *Brady* in support of its contention that "Davis raises the level of abstraction too high" because *Brady* and its progeny "do[] not require that a defendant be informed of all remotely possible consequences of a waiver," Maj. Op. at 18, it ignores the aspect of *Brady* that controls this case. Even if "[t]he identity of a sentencing judge has never been one of th[e] likely consequences" contemplated by *Brady*, Maj. Op. at 18 (quotations omitted), the Court explicitly contemplated that the relevant circumstances and likely consequences include "unfulfillable promises," "misrepresentation," and "the actual value of any commitments made to [the defendant] by the court, prosecutor, or his own counsel." *Brady*, 397 U.S. at 748, 754–55 (quotations omitted). With a full understanding of Supreme Court precedent, the Majority's suggestion that Davis needed only to "understand[] the nature of the [jury] right and how it would likely apply *in general*" falls flat. Maj. Op. at 18 (alterations added) (emphasis in original) (quotation omitted).

Finally, the Majority blithely states that "[f]airminded jurists could reject Davis's contention that his waiver is invalid because he harbored a private belief that the three named judges would sentence him in perpetuity." Maj. Op. at 19. Davis's "belief" was far from private and was reinforced multiple times on the record by his counsel, the presiding judge, and the prosecutor. Davis stated explicitly in his motion for notice that he wanted to know the identities of the judges before he decided to waive his jury right. This motion was then discussed on the record, and the presiding judge provided Davis with the names of the specific judges. Thereafter, Davis, his counsel, and the presiding judge signed a waiver form that included these three judges' names. At the waiver colloquy, the presiding judge reaffirmed the members of the three-judge panel, acknowledged their inclusion in the waiver form, and accepted the waiver as knowing, voluntary, and intelligent. Moreover, it was established under Ohio law that Davis's

---

**[12]**To do so, the Majority frames Davis's argument as granular: "here those unique circumstances included the waiver's naming of three particular judges to the panel. But this is not a unique circumstance that has been clearly established." Maj. Op. at 18 (stating that "[t]he identity of a sentencing judge has never been one of those likely consequences" (quotations omitted)). But Davis argues that he was "assured"—or promised—the specific three-judge panel without knowing that that assurance would not apply under certain circumstances—"if those judges were not available." D. 53 (Appellant Suppl. Br. at 15) (quoting *Brady*, 397 U.S. at 755 for the proposition that "a waiver is invalid if induced through 'unfulfilled or unfulfillable promises'"). Stated differently, Davis argued that he was induced by an unfulfillable promise in direct violation of *Brady*.

jury waiver would bind him upon resentencing.  *See State v. Foust*, 823 N.E.2d 836, 852 (Ohio 2004) ("The waiver of the right to trial by jury in a capital case applies to both the guilt phase and the penalty phase of the trial."); *Davis XI*, 2011 WL 646404, at *7 ("[T]he Ohio legislature has statutorily foreclosed the possibility of withdrawing a jury waiver after a panel of three judges determines guilt.").  Therefore, to the extent the Majority suggests Davis's understanding that his jury waiver would bind him at resentencing was "private," this contention is contradicted by the record and Ohio law.  Rather than requiring that the court search for "myths to bust," the record and law make clear that Davis's explicit concern with the specific three-judge panel could in no way be considered a "private belief."  *Cf.* Maj. Op. at 19 (quotations omitted).

For the reasons explained above, Davis was induced to waive his jury right based on the unfulfillable promise of a specific three-judge panel.  Accordingly, I would find that Davis's waiver was not knowing and voluntary and that he is therefore entitled to relief on this claim.

## C.  Ineffective Assistance of Counsel

Davis brought two ineffective-assistance-of-counsel claims that, in my view, warrant relief.  The first is based on counsel's failure to move for Judge Nastoff's recusal, and the second is based on counsel's failure to investigate and prepare two witnesses.  I will address each in turn.

### 1.  The Recusal Claim

Davis claims that trial counsel at his third sentencing hearing were constitutionally ineffective for failing to move to recuse Judge Nastoff for bias or the appearance thereof, given his death-penalty prosecution of Davis's nephew.  The Ohio Court of Appeals concluded that trial counsel's decision not to seek Judge Nastoff's recusal was strategic and therefore it did not constitute ineffective assistance of counsel.  *State v. Davis*, No. CA2012-12-258, 2013 WL 4806935, at *6 (Ohio Ct. App. Sept. 9, 2013) (*Davis XIII*).  Because the Ohio Court of Appeals adjudicated this claim on the merits—at least as to *Strickland*'s performance prong—the deference requirements of § 2254(d) apply to that prong.

To demonstrate ineffective assistance of counsel, a petitioner typically must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the

defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In the context of judicial-bias ineffective-assistance-of-counsel claims, however, a defendant need not prove prejudice under *Strickland* because, if proven, "judicial bias is a structural defect." *Coley v. Bagley*, 706 F.3d 741, 750 (6th Cir. 2013) (citing *Arizona. Fulminante*, 499 U.S. 279, 309–10 (1991)). In other words, a *Strickland* claim based on judicial bias has two prongs: (1) judicial bias and (2) deficient performance.[13] Accordingly, the operative questions are whether Judge Nastoff's potential for bias violated due process, and, if so, whether the Ohio Court of Appeals unreasonably applied Supreme Court precedent in determining that trial counsel's decision not to seek recusal was reasonable. *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) (holding that, if trial counsel's failure to litigate a constitutional claim competently "is the principal allegation of ineffectiveness," petitioner must also prove that the underlying constitutional claim is "meritorious").

### a. Judicial Bias

The Ohio Court of Appeals did not address the issue of whether Judge Nastoff's potential bias rose to the level of constitutional error and instead simply concluded that the decision of Davis's trial counsel not to seek Judge Nastoff's recusal was strategic. *See Davis XIII*, 2013 WL 4806935, at *6. The judicial-bias portion of Davis's claim is therefore subject to de novo review. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (explaining that when no "state courts below [have] reached" a prong of a petitioner's claim, "our review is not circumscribed by" AEDPA's requirements); *Rayner v. Mills*, 685 F.3d 631, 638–39 (6th Cir. 2012) (holding that when a state court reviews only one portion of a claim in disposing of the claim, we review de novo any portions of the claim that the state court did not review). The Majority offers no reason that the Supreme Court's guidance in *Wiggins* and our prior precedent in *Rayner* ought not to apply here. Instead, the Majority simply assumes that AEDPA deference applies to the judicial-bias prong of Davis's claim even though no state court reviewed it. *See* Maj. Op. at 20–21 (finding that "Davis's claim fails on AEDPA review because it is not clearly established that a

---

[13]The Majority contends that it is incorrect to frame this claim as having two *Strickland* prongs. But even if, as the Majority suggests, counsel's performance and the merits of the underlying judicial-bias claim should be considered together under the performance prong of *Strickland*, de novo review would still apply because, as explained below, the state court unreasonably applied *Strickland* to the performance prong. *See infra* Part I.C.1.b.

judge's prior involvement in the prosecution of a defendant's family member creates 'an impermissible risk of actual bias' in the defendant's case." (quoting *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016))).  Seeing no reason not to apply the binding rule of *Wiggins* and *Rayner*, I review de novo this prong of Davis's claim.

The Supreme Court has held that judicial bias violates due process when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  The standard is objective, and thus courts ask "not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009).  This is because "both the appearance and reality of fairness" must be preserved so that litigants are assured "that the arbiter is not predisposed to find against [them]." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

This case is analogous to *Williams v. Pennsylvania*, which concluded that "there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case." 579 U.S. at 8.  In coming to its decision in *Williams*, the Court reasoned that there is "a risk that the judge 'would be so psychologically wedded' to his or her previous position as a prosecutor that the judge 'would consciously or unconsciously avoid the appearance of having erred or changed position.'" *Id.* at 9 (quoting *Withrow*, 421 U.S. at 57).  Likewise, the Court concluded that "the judge's 'own personal knowledge and impression' of the case, acquired through his or her role in the prosecution, may carry far more weight with the judge than the parties' arguments to the court." *Id.* at 9–10 (quoting *In re Murchison*, 349 U.S. 133, 138 (1955)).

This logic applies with equal force to Judge Nastoff's role as a prosecutor in cross-examining Thompson's family and friends.  As part of his strategy during the Thompson trial, then-prosecutor Nastoff, argued that Thompson had his friends and family members come into court to lie on his behalf.  R. 4-46 (Postconviction Pet. Ex. N at 1207) (Page ID #6458) (Nastoff arguing that Thompson "buil[t] [his] alibi by lying, by getting [his] friends and family to come in, that's important when you lie. You know, it's a mockery, it's an absolute mockery.  A lie is

nothing but a tool."); *see also id.* at 1205 (Page ID #6456) (Nastoff describing Lawrence Jones as a liar who told Thompson that he (Jones) would "clear [Thompson's] name right off the map. Blood [is] thicker than water. You my family," and arguing that Thompson's family and friends "aren't set to snitch").

Although it is true that Judge Nastoff served as a prosecutor in Thompson's case and not in Davis's prior case, he did have significant personal involvement as a prosecutor in the cross-examination, and therefore the undermining and discrediting of critical mitigation evidence such that he formed an opinion that was pertinent to Davis's mitigation case. *See* R. 4-46 (2011 Postconviction Pet. Ex. D, Menashe Aff. ¶ 23) (Page ID #6279) (noting that "[i]t would be difficult, if not impossible, to put aside Judge Nastoff's prior opinions about *the veracity and strength* of the mitigation" (emphasis added)). Specifically, as discussed above, Judge Nastoff formed negative opinions about the mitigation evidence presented by Thompson and Davis's relatives during Thompson's trial. *See* R. 4-46 (2011 Postconviction Pet. Ex. D, Menashe Aff. ¶ 23) (Page ID #6279). Judge Nastoff was necessarily a biased actor because it was his job as a prosecutor to represent the interests of the state. *Cf. Coley*, 706 F.3d at 749–51. Thus, there is an impermissible risk that Judge Nastoff's critical view of the mitigation evidence from his time as a prosecutor would carry more weight than the arguments that Davis actually presented to the court. Similarly, given his view of Thompson's family and friends, there is a danger that Judge Nastoff remained "psychologically wedded" to his position as a prosecutor and thus would not want to give the appearance of reversing his position on their credibility.

The Majority's analysis of the judicial-bias prong sidesteps the facts of this case by claiming that "Davis has never identified the alleged overlapping evidence between" the trials. Maj. Op. at 22. Specifically, the Majority contends that Carol Smith—Davis's sister and Thompson's mother who testified at Davis's sentencing hearing—is too "tenuous" an overlap because her testimony at Davis's sentencing was "unrelated to Thompson" and she did not testify at Thompson's mitigation trial. *Id.* The Majority's suggestion that Smith's testimony at Davis's sentencing needed to be related to Thompson ignores the source of Judge Nastoff's bias (and notably absent from the Majority is any discussion of Judge Nastoff's actual biased statements). Instead, the relevant overlap is in Davis's and Thompson's shared friends and family members

more broadly. At the third sentencing, Davis's mitigation strategy was almost entirely reliant on his family members' and close friends' testimony. The mitigation witness list included the following family members and close family friends: Victor Davis, Sherry Davis, Charles Tipton, Alluster Tipton, Carol Smith, and Rick Rotundo. R. 5-7 (2009 Mitigation Hr'g Tr. Vol. I at 78) (Page ID #8268) (V. Davis, brother); *id.* at 98 (Page ID #8288) (S. Davis, daughter); *id.* at 104–05 (Page ID #8294–95) (C. Tipton, stepfather); *id.* at 113–14 (Page ID #8303–04) (A. Tipton, mother); R. 5-8 (2009 Mitigation Hr'g Tr. Vol. III at 207–08) (Page ID #8397–98) (Rotundo, neighbor and family friend). It was therefore vital that his family members were credible to the panel.

Davis's and Thompson's family were close knit and spent a significant amount of time together. Davis had the closest relationships with his siblings Smith and Elliot Davis. R. 5-7 (2009 Mitigation Hr'g Tr. Vol. I at 85) (V. Davis) (Page ID #8275). Multiple generations, at times, lived under the same roof. *Id.* at 82 (V. Davis) (Page ID #8272) (explaining that he lived with his mother and siblings, as well as his "grandmother, her sister, [Victor's] great aunt, her eldest sister, [Victor's] grandmother's eldest brother, and his wife"). Smith, at the time that she testified in Davis's trial, lived with Davis's mother and stepfather. *Id.* at 104 (Page ID #8294) (C. Tipton). Smith also testified about gatherings that involved the extended family. *Id.* at 128–29 (Smith) (Page ID #8318–19) (explaining that Davis's extended family, including his living, non-incarcerated siblings and his daughter, have had family gatherings since Davis's incarceration). This overlap is significant. That Davis does not identify a specific piece of evidence is not the point. Davis's mitigation defense relied on the credibility of his family members, and Judge Nastoff had a particularly negative view of this family's credibility based on his experience prosecuting Thompson.

The three-judge panel, including Judge Nastoff, "considered the testimony of [Davis's] friends and family concerning his dysfunctional family and childhood experiences" and found "the testimony to be unconvincing and entitled to little or no weight." R. 4-39 (2009 Sent'g Op. at 9) (Page ID #4932). "The panel . . . also considered the testimony of Sherry Davis and the fact that she has forgiven [Davis] for purposefully killing her mother" and "afford[ed] this factor very

little weight." *Id.* In other words, Judge Nastoff and the panel concluded that all six of Davis's friends and family members were unconvincing.

Because Davis relied principally on his family members during his sentencing hearing, "the probability of actual bias on the part of" Judge Nastoff as it relates to the veracity and strength of Davis's mitigation evidence "[wa]s too high to be constitutionally tolerable," *Withrow*, 421 U.S. at 47, especially in a death-penalty case.

### b. Performance

The remaining question is therefore whether the Ohio Court of Appeals unreasonably applied clearly established federal law in determining that trial counsel's recusal decision was not deficient performance. The Ohio Court of Appeals provided little reasoning for its holding, other than the fact that trial counsel were aware that Judge Nastoff had prosecuted Thompson and still chose not to challenge him. *Davis XIII*, 2013 WL 4806935, at *6.

When addressing the performance prong, the state court explained that Davis's counsel stated on the record that "they were aware of Judge Nastoff's prior participation in Thompson's prosecution [Davis's nephew's prosecution], but chose not to seek recusal." *Davis XIII*, 2013 WL 4806935, at *6. The court then stated that "[t]he decision not to seek recusal of the judge can *only* be viewed as strategic and *will not form the basis* of an ineffective counsel claim." *Id.* (emphasis added) (quoting *State v. Nuhfer*, No. L-07-1125, 2009 WL 806905, at *3 (Ohio Ct. App. Mar. 20, 2009)).[14] The court concluded that Davis's ineffective-assistance claim therefore failed. *Id.* This analysis was an unreasonable application of *Strickland* because the court "simply assumed that counsel's [decision] w[as] motivated by strategy" without determining whether that decision was reasonable under the circumstances. *Dickerson v. Bagley*, 453 F.3d 690, 697 (6th Cir. 2006). Most notably missing from its analysis was any consideration of whether there was an unconstitutionally high risk of bias, and the reasonableness of counsel's investigation into the potential for bias. Although trial counsel's strategic choices are protected,

---

[14]The Majority appears to conclude that the Supreme Court of Ohio's reliance on *Nuhfer* means that it applied the correct standard. Maj. Op. at 21. But the Majority identifies aspects of *Nuhfer* that the state supreme court did not cite. Instead, the Supreme Court of Ohio identified a *quote* that it used as an irrebuttable presumption. There is no reason to believe that the Supreme Court of Ohio chose a specific quote but, in reality, intended to use a broader portion of *Nuhfer*. Rather than rewrite the state supreme court opinion, I take it as it is.

they must be "reasonable" based on the "totality of the circumstances." *Strickland*, 466 U.S. at 681 (quotations omitted). By deferring to counsel's determination with no consideration of "the totality of the circumstances," *Strickland*, 466 U.S. at 681 (quotations omitted), the Ohio Court of Appeals unreasonably applied *Strickland*. *Cf. Dickerson*, 453 F.3d at 697 ("[T]he state court unreasonably applied clearly established Supreme Court precedent when it simply assumed that counsel's oversights were motivated by strategy.").

Here, Davis's trial counsel performed deficiently, because no competent attorney would reasonably choose to proceed with a capital-sentencing hearing before a court that was constitutionally deficient. Davis is therefore entitled to relief on this claim. *See McKernan v. Superintendent Smithfield SCI*, 849 F.3d 557, 566–67 (3d Cir. 2017) (finding that trial counsel performed deficiently in "advis[ing] his client to proceed before a court that was structurally deficient" as a result of the judge's potential for bias, which the Third Circuit concluded was "something no competent attorney would ever do").

Rather than engage with the record, the Majority flatly repeats and reaffirms the state supreme court opinion's flaws, enshrining them into Sixth Circuit law. The Supreme Court has instructed that "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision. . . . Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Wiggins*, 539 U.S. at 527. In other words, the fact of an investigation says nothing about its reasonableness. Nonetheless, the Majority—in conflict with Supreme Court precedent—concludes that the state court properly applied "a strong presumption" that Davis's counsel performed a reasonable expectation based on the court's "assum[ption] that counsel made at least some investigation," Maj. Op. at 21, without any consideration of "the reasonableness of the investigation," *Wiggins*, 539 U.S. at 527. For the reasons explained above, the state supreme court unreasonably applied *Strickland* and, had counsel moved for Judge Nastoff's recusal, such a motion would have been successful. I would therefore find that Davis is entitled to relief on his Judicial-Bias Claim.

**2. The Failure-to-Investigate Claim**

**a. AEDPA Deference**

Davis next argues that trial counsel at his third sentencing hearing were constitutionally ineffective for failing reasonably to investigate, prepare for, and present mitigation testimony from Cynthia Mausser and Dr. Robert Smith. The Ohio Court of Appeals concluded that the decision to call Mausser as well as the "decision to engage, or not engage, in a particular line of questioning" with Mausser and Smith were "presumed to be the product of sound trial strategy" and therefore did not constitute ineffective assistance of counsel. *Davis XIII*, 2013 WL 4806935, at *5.[15]

Although *Strickland* established that it is "strongly presumed" that counsel performed adequately and reasonably exercised their professional judgment in making decisions, it did not create an irrebuttable presumption that any act with strategic implications is reasonable and cannot constitute deficient performance. 466 U.S. at 690. The Supreme Court has confirmed that taking the approach that the Ohio Court of Appeals took constitutes an incorrect reading of *Strickland*. *See Wiggins*, 539 U.S. at 527 ("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy."). Moreover, by concluding that it would "not question counsel's strategic decision" regarding questioning witnesses, the Ohio Court of Appeals unreasonably applied *Strickland* by imposing a far higher presumption of reasonableness than *Strickland* requires, and by altogether failing to consider the reasonableness of the investigation and preparation that supported trial counsel's choices, as required by *Wiggins*. *Davis XIII*, 2013 WL 4806935, at *5. The Ohio Court of Appeals' decision on the merits rests entirely on this unreasonable application of *Strickland* and *Wiggins*.

---

[15]In an effort to revise the Ohio Court of Appeals' opinion to fit its argument, the Majority again, *see supra* n.14, contends that the state court's invocation of a specific quote from prior case should be read as a citation to a broader portion of that underlying opinion. Maj. Op. at 23–24. Rather than rewrite the state court opinion, I take it as it is.

The Supreme Court's precedents also clearly establish that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Here, trial counsel promised in their opening statement that Mausser would provide specific testimony, despite failing adequately to investigate what her testimony would be. Counsel then compounded this failure to investigate by calling Mausser to testify even after being warned by the prosecution that Mausser would not provide the promised testimony. This court has previously held that it is an unreasonable application of clearly established law to conclude that trial counsel did not perform deficiently in such a scenario. *English v. Romanowski*, 602 F.3d 714, 728–29 (6th Cir. 2010); *see also Avery*, 548 F.3d at 436–37 (holding that a court of appeals may look to its own decisions to determine whether a legal principle has been clearly established by the Supreme Court). This logic applies with equal force to Davis's counsel in their failure to adequately investigate what testimony Mausser would provide before promising the specifics of her testimony in an opening argument.

As noted above, the Ohio Court of Appeals failed to address the fact that Davis raised his claim under the rubric of trial counsel's failure to *investigate* and *prepare for* Mausser and Dr. Smith's testimony, R. 4-46 (2011 Postconviction Pet. ¶¶ 64–65, 76–77) (Page ID #6248, 6251), instead characterizing the claim as grounded only in trial counsel's strategic decision to call Mausser and engage in particular lines of questioning with Mausser and Dr. Smith, *see Davis XIII*, 2013 WL 4806935, at *5. The Ohio Court of Appeals thus did not adhere to the Supreme Court's instruction that, in such cases, the "principal concern" is "not whether counsel should have presented" certain mitigation evidence, but instead "whether the investigation supporting counsel's decision . . . *was itself reasonable*." *Wiggins*, 539 U.S. at 522–23 (emphasis in original). For these reasons, I review de novo Davis's claim that trial counsel failed to adequately investigate and prepare for Mausser and Dr. Smith's testimony.

### b. Performance

Davis's Failure-to-Investigate Claim rests on three interrelated deficiencies: (1) counsel "promised the panel it would hear certain testimony []from Cynthia Mausser" even though counsel was "on notice that [Mausser] could not deliver that testimony," (2) counsel "failed to properly investigate and prepare" Mausser and Dr. Robert Smith, and (3) because of the failure

to investigate and prepare, counsel "elicited harmful testimony . . . from Dr. Smith." D. 53 (Appellant Suppl. Br. at 20–21). I will address the testimony of Mausser and Smith in turn and evaluate counsel's investigation and preparation as it relates to each witness.

### i. Cynthia Mausser

Rather than consider the facts of this case, the Majority instead insists that defense counsel's investigation related to Mausser was presumptively reasonable because there was "at least some prior investigation" and "defense counsel were so confident that the prosecution was incorrect that they were ready to testify under oath that that is not what [they] were told." Maj. Op. at 24 (quotations omitted). But, for the reasons discussed below, defense counsel's confidence only serves to underscore the lack of reasonable investigation.

During Davis's counsel's opening statement, counsel told the three-judge panel to expect Mausser, the Chair of the Ohio Parole Board, to explain that because of Davis's "prior record[] [and] the fact that he committed the second murder[] while he was still on parole from the first murder, . . . he will not be paroled." R. 5-7 (2009 Mitigation Hr'g Tr. Vol. I at 36–37) (Page ID #8225–26). Counsel intended to use this testimony to argue that, although a life without the possibility of parole was not available as a sentencing option, it was "a very de facto possibility in this case." *Id.* at 37 (Page ID #8226). Counsel were aware that, because the case had been pending for approximately 25 years and Davis was requesting a sentence of life with parole eligibility after serving 30 years, the panel was concerned that Davis would be parole eligible soon. *Id.* at 38 (Page ID #8227).

In her postconviction affidavit, Mausser explained that she "never told defense counsel that Mr. Davis would never be paroled." R. 4-46 (Postconviction Ex. F ¶ 4) (Page ID #6365). She explained that she "cannot predict" the outcome of Davis's parole case, in part, because she cannot "predict what other Parole Board members would do." *Id.* ¶ 6 (Page ID #6365). Likewise, Mausser could not even testify as expected regarding her own opinion because "[d]efense counsel did not provide [her with] Mr. Davis's entire file which would [have been] necessary . . . to give any opinion on whether [she] would likely vote to parole Mr. Davis." *Id.* ¶ 7 (Page ID #6366); *see also* R. 5-7 (2009 Mitigation Hr'g Tr. Vol. I at 181–82) (Mausser)

(Page ID #8371–72) (testifying before the panel that she had only "a very small amount of the information" that she would need to give an accurate opinion).

Before counsel presented Mausser's testimony during the 2009 mitigation hearing, the state objected, arguing that the prosecutor had "spoken to Ms. Mausser" and that, because the parole board included "seven to twelve people," Mausser told the state "that she would not be in a position to be able to testify whether or not she would vote for parole" and that "she could not say what a majority of the board would do." *Id.* at 133 (Page ID #8323). Defense counsel then conceded that they would "be *in a position of surprise and affirmative damage* if she testifie[d] as the prosecution . . . suggest[ed] because [defense counsel], in fact, interviewed her four months ago and . . . that [wa]s not what [they] were told." *Id.* at 137 (Page ID #8327) (emphasis added).

Mausser then testified "as the prosecution . . . suggest[ed]." *Id.* She initially stated that certain aspects of Davis's case—such as his prior murder conviction and the fact that his later crime occurred while he was on probation—would negatively impact his parole request. *Id.* at 154–55, 159–61 (Mausser) (Page ID #8344–45, 8349–51). She also explained that Davis would score negatively in terms of his criminal history and that he would likely not be granted parole at his first parole hearing. *Id.* at 154–55, 175 (Mausser) (Page ID #8344–45, 8365). Mausser hypothesized that someone like Davis "would likely spend a large portion of the remainder of [his] life in prison." *Id.* at 175 (Mausser) (Page ID #8365).

On cross examination, however, she revealed that, although she had access to some of Davis's file, she did not have most of the materials that would be relevant for her to make a parole determination. *Id.* at 181–82 (Mausser) (Page ID #8371–72). If not granted parole at the initial hearing, Mausser explained, Davis would be eligible for a second hearing within ten years. *Id.* at 179–80 (Mausser) (Page ID #8369–70). Mausser also stated that she could be terminated at any point and that she could not predict how any of the other members of the parole board would vote. *Id.* at 177, 183–84 (Mausser) (Page ID #8367, 8373–74). Finally, and most notably, Mausser explained that she could not state with "any level of certainty" how the board would vote on Davis's parole eligibility or even how she would vote when Davis became eligible for parole. *Id.* at 188–89 (Mausser) (Page ID #8378–79).

In the sentencing opinion, the court emphasized that "Mausser could not . . . state with any certainty if or when [Davis] might be paroled if th[e] Court imposed a sentence less than death." R. 4-39 (2009 Sent'g Op. at 6–7) (Page ID #4929–30). When weighing the mitigating and aggravating circumstances, the panel reasoned that Mausser's testimony was "highly speculative and unconvincing and entitled to no weight." *Id.* at 10 (Page ID #4933).

This court has previously explained that counsel's performance can be considered constitutionally deficient due to failure to conduct a reasonable investigation if counsel promises the factfinder evidence that they cannot deliver. In *English*, 602 F.3d at 728–29, we held that counsel was ineffective because "it was objectively unreasonable for English's trial attorney to decide before trial to call [English's then-girlfriend] as a witness, make that promise to the jury, and then later abandon that strategy, all without having fully investigated [his then-girlfriend] and her story prior to opening statements." Likewise, in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000), we explained that "defense counsel's failure to have questioned [the witness] in this regard prior to trial is inexcusable" because "[d]efense counsel should have known [the witness's] opinion on this ultimate issue and should have prepared accordingly." These cases are not only analogous to the facts at issue here, but they also align with Supreme Court's instruction that the "principal concern" is "not whether counsel should have presented" certain mitigation evidence, but instead "whether the investigation supporting counsel's decision . . . *was itself reasonable*" such that counsel's strategic decision was an informed one. *Wiggins*, 539 U.S. at 522–23; *see also Williams v. Taylor*, 529 U.S. 362, 395–96 (2000). Today, the Majority makes the first inquiry its principal concern while wholly ignoring the latter.

Although counsel spoke with Mausser before trial, it is apparent that counsel did not know that she would testify that she could not determine whether Davis would ever be paroled. R. 5-7 (2009 Mitigation Hr'g Tr. Vol. I at 137) (Page ID #8327). Thus, counsel either did not ask Mausser this key question that framed their entire mitigation case and nonetheless called this witness without knowing her "opinion on this ultimate issue," *Combs*, 205 F.3d at 288, or counsel asked Mausser this question and knew the answer was not what counsel promised during opening, *English*, 602 F.3d at 728–29. This is reinforced by Mausser's affidavit, in which she states that counsel either never asked her this question or, if they did, she did not give the answer

that they promised during their opening argument. *See* R. 4-46 (Postconviction Ex. F ¶¶ 4, 6) (Page ID #6365). Either way, counsel failed to conduct a reasonable investigation and counsel's "confidence" in their belief that Mausser would testify differently does not make their investigation sufficient. *Cf.* Maj. Op. at 24. Accordingly, I would find that counsel performed deficiently because counsel failed adequately to investigate and prepare for Mausser's testimony.

### ii. Robert Smith

After presenting Mausser's testimony, counsel compounded the above-described error with the testimony they elicited from Smith. Despite the concern that Davis could be paroled, Smith did not testify about whether Davis would succeed outside of prison. Instead, Smith diagnosed Davis with borderline personality disorder and alcohol dependence at the time of the offense. R. 5-8 (2009 Mitigation Hr'g Tr. Vol. III at 248) (Page ID #8438). Smith described many of the characteristic behaviors of individuals with borderline personality disorder, including "very dramatic mood swings" and "unwarranted aggressive behavior that comes about with minor provocation." *Id.* at 257, 261 (Page ID #8447, 8451). And Smith noted that, in people with these disorders, there is often "[i]mpulsivity that is severe, they act and then think about it afterwards. They are not really considering their actions and what the consequences will be." *Id.* at 263 (Page ID #8453); *see also id.* ("It is a chronic disorder."). Finally, Smith explained that Davis had adjusted and would continue positively to adjust in a structured prison environment but that Davis would have struggled to adjust in the community if there was no clear structure. *Id.* at 258 (Page ID #8448). Along those same lines, Smith testified that "Borderlines and people with alcohol dependence do very well in a structured environment," explaining:

> "[I]n a prison setting [they] don't have a lot of decisions to make, [they] don't have lots of opportunities to act out and [they] also don't form lots of relationships. [They] are pretty much restricted in what [they] get to do, when [they] get to do it, and [they] have supervision at all times regarding what [they] [are] doing."

*Id.* at 283–84 (Page ID #8473–74).

When considering Smith's testimony, the resentencing court identified a glaring deficiency: "Smith failed to forecast [Davis's] behavior or recommend a treatment plan, should

he eventually be released from prison." R. 4-39 (2009 Sent'g Op. at 8) (Page ID #4931). In his postconviction affidavit, Smith explained that he was not aware that his opinion about whether Davis would succeed on parole was relevant. R. 4-46 (Postconviction Ex. I ¶ 11) (Page ID #6382). Smith stated that, had he been asked, he would have testified that Davis's experience living in a structured setting for approximately 25 years at the time of resentencing had taught Davis "to accept external rules and expectations" and had allowed Davis to "develop[] coping strategies to deal effectively with frustration, annoyance, disappointment, etc." *Id.* ¶ 12 (Page ID #6382).

The Majority claims that counsel's failure to elicit this testimony was reasonable because "Mausser's testimony was that Davis would likely not be paroled before the end of his natural life." Maj. Op. at 24. But, as already explained, Mausser's testimony was wholly inconclusive on whether Davis would be paroled before the end of his natural life. Thus, Smith's testimony about Davis's potential for success if he were to remain incarcerated does not impact the negative effects of the lack of testimony about whether Davis would succeed if released on parole. Indeed, without the latter testimony from Smith, Smith and Mausser's combined testimony could support only a sentence of life without the possibility of parole, and that sentence was not an available option. Instead, the closer option to life without the possibility of parole—indeed the sentence that was ultimately imposed—was a death sentence. For the reasons explained above, I would find that counsel's investigation and preparation of Smith's testimony was also constitutionally deficient.

### c. Prejudice

Because the Ohio Court of Appeals held that trial counsel's performance was not deficient, it did not address the prejudice prong of Davis's claim, and thus I review de novo whether Davis was prejudiced by trial counsel's performance. *See Wiggins*, 539 U.S. at 534; *Williams v. Anderson*, 460 F.3d 789, 804 (6th Cir. 2006). To show prejudice, Davis must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This probability must be "sufficient to undermine confidence in the outcome." *Id.*

Here, Davis was prejudiced by trial counsel's deficient performance. The sentencing panel described Mausser's testimony as "highly speculative and unconvincing" and determined it was "entitled no weight" as a mitigating factor. R. 4-39 (2009 Sent'g Op. at 10) (Page ID #4933). Following Davis's second sentencing hearing, however, without Mausser's testimony, the Ohio Supreme Court found that the probability that Davis would never be paroled if he were not sentenced to death was entitled to "some weight in mitigation." *State v. Davis*, 584 N.E.2d 1192, 1198 (Ohio 1992) (*Davis IV*). Including Mausser's testimony as they did, therefore, demonstrably detracted from Davis's case in mitigation. The 2009 panel's sentencing opinion also highlighted the fact that "Dr. Smith failed to forecast Defendant's behavior or recommend a treatment plan, should he eventually be released from prison," which demonstrates that such evidence would have been beneficial to the panel in weighing mitigation evidence. R. 4-39 (2009 Sent'g Op. at 8) (Page ID #4931). Thus, Dr. Smith's testimony did in fact prejudice Davis.

The Majority fails to discuss the testimony that Dr. Smith would have provided, had trial counsel effectively prepared him for the parole issue. Specifically, Dr. Smith would have testified that "with time, maturity, and freedom from drugs and alcohol, someone with Borderline Personality Disorder will gain insight and develop coping skills that would enable him to adjust to living in the outside world." R. 4-46 (2011 Postconviction Pet. Ex. I, Smith Aff. ¶ 12) (Page ID #6382). He also would have testified that Davis "at the present time is a different person than he was when he was admitted to [the Ohio Department of Rehabilitation and Correction] in 1984." *Id.* Furthermore, Dr. Smith would have testified that:

> Having been in a structured setting for the past 27 years, [Davis] has learned to accept external rules and expectations regarding his behavior. He has developed coping strategies to deal effectively with frustration, annoyance, disappointment, etc. He has learned to weigh the potential consequences of his decisions and actions.

*Id.* Finally, he would have "explained that the parole process itself would provide [Davis] with significant structure and guidelines that would assist him in successfully re-entering society." *Id.* ¶ 13) (Page ID #6382).

This testimony would have left the state-court panel with a substantially different picture of Davis than Smith's actual testimony provided, because his actual testimony focused on Davis's state of mind in 1984 such that Smith did not explain how Davis had changed in the intervening years and why Davis could now be paroled without necessarily presenting a danger to the community. Smith's proffered testimony would have strengthened the evidence of Davis's good behavior while in prison, because it would have established how his behavior was demonstrative of broader changes that Davis had made that would also allow him to live successfully outside of a carceral environment. Instead, the state-court panel was left with the impression that Davis would be dangerous were he to be paroled, and that, as a result of Mausser's testimony, imposing a death sentence was the only way to prevent his release.

The issue of whether Davis would be paroled, and if so, whether he would present a danger to society was plainly a major factor in the panel's decision regarding whether to impose a death sentence. The errors that trial counsel made in investigating and preparing Mausser's and Smith's testimony are substantial enough to undermine any confidence in the outcome of the sentencing hearing. Trial counsel's deficient performance likely negatively impacted the weight the panel assigned to several of Davis's mitigating factors, and thus there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Perhaps recognizing that counsel's errors prejudiced Davis, the Majority contends that "Davis cannot show prejudice because the [Supreme Court of Ohio's] independent review . . . cured any error" by "g[iving] weight to the 'likelihood that Davis will never be released from prison.'" Maj. Op. at 25 (quoting *Davis XIV*, 9 N.E.3d at 1056). Even if the Warden did not forfeit this argument by failing to raise it at any point before this case reached en banc review, and even assuming that it is proper to consider the Ohio Supreme Court opinion as opposed to the Ohio Court of Appeals opinion that assessed Davis's Failure-to-Investigate Claim, *see* D. 59 (Appellant Suppl. Reply Br. at 13), this argument lacks merit. The Ohio Supreme Court first determined that it "afford[ed] *no weight* to the testimony of the chair of the parole board regarding the likelihood of parole for a person in Davis's situation" because the "testimony was speculative." *Davis XIV*, 9 N.E.3d at 1056 (emphasis added). In other words, it came to the

same conclusion as the sentencing court on this issue. *See* R. 4-39 (2009 Sent'g Op. at 10 (Page ID #4933). The court then determined that it was likely that, based on Davis's age, he would not be released from prison and that "deserve[d] some weight." *Davis XIV*, 9 N.E.3d at 1056. The court determined only that it was *possible* that Davis would not be released on parole. Thus, this "weighing" does not actually address the prejudice created by Mausser's testimony because the possibility of parole remained.

Moreover, the Ohio Supreme Court necessarily could not consider the evidence that Smith and Mausser *did not present*. Had Mausser been provided the relevant materials and been properly prepared, she would have been able to testify credibly to whether she would be likely to vote to grant Davis parole, such that her opinion could have been given at least some—as opposed to no—weight. *See Davis XIV*, 9 N.E.3d at 1056; R. 4-46 (Postconviction Ex. F ¶ 7) (Page ID #6366). Smith's additional testimony would have explained how Davis would have adjusted if released, which remained a concern to the Ohio Supreme Court. The reweighing of evidence, under these circumstances, therefore, cannot cure the prejudice because the court did not address the issues created by Mausser's testimony and could not assess testimony from both Mausser and Smith that was not in the record. *Cf. Lundgren v. Mitchell*, 440 F.3d 754, 782–83 (6th Cir. 2006) (finding that the state court cured any potential prejudice because it reweighed the evidence and omitted the alleged prosecutorial misconduct from the otherwise complete record); *Post v. Bradshaw*, 621 F.3d 409, 419–20 (6th Cir. 2010) (finding that "[a]ny error was cured when the Ohio Supreme Court . . . independently reweighed the aggravating and mitigating factors and affirmed the sentence of death" because the state court omitted the improper evidence from the otherwise complete record). Accordingly, for the reasons explained above, Davis was prejudiced by counsel's failure to investigate and prepare Mausser's and Smith's testimony. I would therefore hold that Davis is entitled to relief on this claim.

## II. CONCLUSION

Today's Majority finds both that Davis must be held to his 1984 jury waiver and that the waiver was knowing and voluntary, despite the fact that the promise that induced Davis's waiver is not being enforced. Excising the promise of the three-judge panel from the jury waiver, the Majority enforces the waiver against Davis while simultaneously holding that the aspect of the

waiver that benefits Davis is not enforceable. At bottom, the Majority creates a rule that allows death-eligible defendants to be induced by unenforceable promises to waive their constitutional right to a jury trial, leaving these individuals with no recourse to vindicate their constitutional rights. This plainly contradicts binding Supreme Court precedent. Likewise, the Majority finds that the state court properly applied *Strickland*'s presumption to counsel's failure to move for recusal and decision to present incomplete mitigating evidence, even though the state court *never assessed* the adequacy of counsel's investigation and preparation. This, too, conflicts with longstanding Supreme Court precedent. I therefore respectfully dissent.